GLANCY BINKOW & GOLDBERG LLP
Lionel Z. Glancy (#134180)
Michael Goldberg (#188669)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA  90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: info@glancylaw.com

*Liaison Counsel for Lead Plaintiff*

COHEN MILSTEIN SELLERS & TOLL
    PLLC
Steven J. Toll
Julie Goldsmith Reiser
S. Douglas Bunch
1100 New York Avenue N.W.
Suite 500, West Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
Email: jreiser@cohenmilstein.com

*Lead Counsel for Lead Plaintiff and the Class*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Stephanie Mallen, Individually and On Behalf Of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ALPHATEC HOLDINGS, INC., HEALTHPOINT CAPITAL PARTNERS, LLP, HEALTHPOINT CAPITAL PARTNERS II, LLP, DIRK KUYPER, PETER C. WULFF, MORTIMER BERKOWITZ, III, JOHN H. FOSTER, JAMES R. GLYNN, STEPHEN J. HOCHSCHULER, SIRI S. MARSHALL, R. IAN MOLSON, STEPHEN E. O'NEIL, JEFFERIES & COMPANY, INC., CANACCORD ADAMS INC., COWEN AND COMPANY, LLC, and LAZARD CAPITAL MARKETS, LLC, <br><br> Defendants. | Case No. 3:10-cv-01673-BEN -CAB <br><br> **CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

Page

I.     NATURE OF ACTION ....................................................................1

II.    OVERVIEW OF THE SEPARATE CLAIMS .................................3

       A.    Secondary Offering Securities Act Claims................................3

       B.    Exchange Act Claims................................................................4

III.   JURISDICTION AND VENUE.......................................................4

IV.    PARTIES.......................................................................................5

V.     CLASS ACTION ALLEGATIONS ................................................10

VI.    SUBSTANTIVE ALLEGATIONS.................................................12

       A.    Background of the Acquisition .................................................12

       B.    Revenue Forecast for the Acqustion.........................................14

       C.    Just Prior to the Acquisition, Defendants Reaffirmes Revenue
             Forecasts for 2010 and that the Integration Would See
             Immediate Results....................................................................15

       D.    Defendants Announce Completion of the Acquisition.............16

       E.    Materially False and Misleading Statements and Omissions
             in the Offering and During the Class Period............................16

       F.    The Truth Emerges...................................................................23

VII.   DEFENDANTS' SCIENTER CONCERNING ALPHATEC'S
       INABILITY TO MEET REVENUE FORECASTS DURING THE
       CLASS PERIOD ..........................................................................25

       A.    Defendants Knew Pricing Pressures in the Spine Industry
             Would Affect Alphatec's Ability to Attain Forecasted
             Revenue for 2010 ....................................................................25

       B.    Defendants Knew that Revenue from Global Sales Would Be
             Insufficient to Meet Revenue Forecasts...................................27

       C.    Defendants Knew of Delays in Integration that Would Impact
             Alphatec's Ability to Achieve Forecasted Revenue .................29

       D.    Additional Scienter Allegations Demonstrate that Defendants'
             Affirmations of Prior Revenue Forecasts During the Class

Period Were Knowingly False When Made .............................30

1.  Channel Stuffing ..............................................30

2.  Removal of CFO ..............................................30

3.  Motive ..........................................................30

VIII. LOSS CAUSATION AND MARKET EFFICIENCY ......................32

IX.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ..............35

X.  CLAIMS .........................................................36

XI.  JURY DEMAND ..................................................45

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

ii

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

Lead Plaintiff Fresno County Employees' Retirement Association ("Lead Plaintiff") alleges the following based on information and belief and upon the investigation of counsel, including a review of United States Securities and Exchange Commission ("SEC") filings by Alphatec Holdings, Inc. ("Alphatec" or the "Company"), public statements, and various media reports. Matters relating to Lead Plaintiff and its own acts are alleged upon personal knowledge. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This is a class action on behalf of purchasers of the common stock of Alphatec. Lead Plaintiff seeks remedies (1) under the Securities Act of 1933 (the "Securities Act") on behalf of all those who purchased or otherwise acquired Alphatec common stock issued pursuant or traceable to the February 12, 2010 Registration Statement and April 16, 2010 Prospectus incorporated therein and were damaged thereby; and (2) under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all those who purchased or otherwise acquired the common stock of Alphatec between April 16, 2010 and August 5, 2010, inclusive (the "Class Period").

2.     Defendants engaged in a scheme to inflate the price of Alphatec shares in order to enable the Company's principal shareholders, HealthpointCapital Partners, L.P. and Healthpoint Capital Partners II, L.P. (together, "Healthpoint"), to dispose of their nearly 95% interest in Scient'x, S.A. ("Scient'x"), a spinal products company based in France; to enable Alphatec and Healthpoint to sell millions of shares of Alphatec stock in the Offering at artificially inflated prices; and, significantly, for the personal benefit of Defendants Berkowitz, Foster, Molson, O'Neil, and Hochschuler (together with Healthpoint, the "Healthpoint Defendants"), who were affiliates and/or had financial interests in Healthpoint.

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 1 -

3.      As set forth below, Alphatec (also a spinal products company), acquired Scient'x in an all-share exchange whereby Alphatec used 24 million newly-issued shares to purchase Scient'x.

4.      The acquisition of Scient'x by Alphatec was not a transaction between parties at arm's length, but rather a merger of two companies largely owned by the same entity: Healthpoint.  Many of Alphatec's board members and insiders were officers of and/or had financial interests in Healthpoint, allowing them inside information about the companies under Healthpoint's control, including Scient'x.  All three companies – Healthpoint, Alphatec, and Scient'x – had engaged in significant business dealings in which information about Scient'x's financial accounting, trade practices, and business strategies had been shared.  After the transaction, Healthpoint owned over 55% of Alphatec.

5.      Just two weeks after the acquisition, at the beginning of the Class Period, Alphatec and Healthpoint each sold 9.2 million shares of Alphatec stock at $5.00 per share, raising $92 million.  Half – or $46 million – went directly into the pockets of the Healthpoint Defendants.

6.      As illustrated below, during the Class Period, Defendants reported that Alphatec's integration with Scient'x was proceeding smoothly and that the acquisition would yield immediate and significant revenue synergies and that, as a result, 2010 *pro forma* revenues would reach $220 to $225 million.  Buoyed by these assurances, Alphatec's shares reached a Class Period high of $7.32.

7.      Yet, following the first complete quarter after the Scient'x acquisition and Offering and just three months after its mid-quarter guidance, Alphatec reported far-worse than expected second quarter earnings and simultaneously **cut its revenue guidance by 24%, slashing estimated 2010 revenue to $177 million**.

8.      During an earnings call after markets closed on August 5, 2010, Alphatec revealed that the integration of Scient'x, contrary to Defendants'

- 2 -

representation on May 10, 2010, had suffered setbacks. Moreover, Defendants first revealed that the hesitancy of certain of Scient'x's distributors to place orders in the second quarter had materially impacted Alphatec's revenues.

9.     In response to this news, an analyst criticized Defendants for such a sharp reversal in guidance despite contrary assurances as late as mid-way through the second quarter.  Additionally, the analyst noted, "[c]onfounding the result in Europe is indication that there may have been some stocking in Europe prior to Alphatec acquiring Scient'x, which could have overstated the run rate there and also created an air pocket of demand in Europe in Q2."  In other words, Scient'x engaged in channel stuffing prior to the acquisition to make the proposed merger between Alphatec and Scient'x more appealing to investors who purchased on the Offering, but resulted in diminished sales following the acquisition.

10.     These wholly unexpected developments prompted a sharp sell-off of Alphatec shares, which ***plunged 46% in value in a single day of trading, falling from \$4.42 to \$2.39, wiping out \$177 million in market capitalization***.  The trading volume on this announcement was astronomical.  As compared with a trading volume of 111,545 shares the day before the earnings adjustment was announced, ***trading volume exploded to 13.2 million shares*** following Alphatec's earnings guidance.

## II.     OVERVIEW OF THE SEPARATE CLAIMS

### A.     Secondary Offering Securities Act Claims

11.     In Counts I through III, Lead Plaintiff asserts claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. § 77l(a)(2), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against the Defendants identified below in ¶¶ 119, 135 and 145.  Lead Plaintiff brings these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who

- 3 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

purchased or otherwise acquired shares issued by Alphatec pursuant or traceable to the February 12, 2010 Registration Statement and April 16, 2010 Prospectus incorporated therein. Pursuant to Fed. R. Civ. P. 8(d), Lead Plaintiff specifically disclaims any allegations of fraud in connection with these Securities Act claims, which sound in strict liability and negligence and are not based on any allegations of knowing or reckless misconduct on the part of any Defendant.

### B.    Exchange Act Claims

12.    In Counts IV and V, Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), against the Defendants identified below in ¶¶ 152 and 159. Lead Plaintiff brings these claims individually and on behalf of all persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired Alphatec securities during the Class Period.

### III.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1331.

15.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

16.    In connection with the acts alleged in this Complaint, Defendants,

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 4 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities exchanges.

## IV.   **PARTIES**

17.   Lead Plaintiff **Fresno County Employees' Retirement Association** ("FCERA" or "Lead Plaintiff"), as set forth in the certification attached hereto, purchased the common stock of Alphatec during the Class Period and has been damaged as a result of the acts alleged herein.  In particular, on April 16, 2010, Lead Plaintiff purchased (a) 18,440 shares in the Offering, at a price of $5.63 per share, from Canaccord Adams Inc.; and (b) 40,760 shares in the Offering, at a price of $5.00 per share, from Jefferies & Company.  FCERA provides retirement benefits for eligible employees of the County of Fresno and for participating agencies including the Fresno-Madera Area Agency on Aging, Clovis Veterans Memorial District, and Fresno Mosquito and Vector Control District.

18.   Defendant **Alphatec Holdings, Inc.** engages in the design, development, manufacture, and marketing of products for the surgical treatment of spine disorders, in particular for the aging spine.  Alphatec is incorporated in the State of Delaware, with principal offices at 5818 El Camino Real, Carlsbad, California 92008.  As a publicly-traded company whose common stock was, and is, registered with the SEC and was, and is, publicly traded on NASDAQ and governed by the federal securities laws, Alphatec had a duty to disseminate accurate and truthful information with respect to its financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, so that the market price of Alphatec's common stock would be based upon truthful and accurate information.  Alphatec's material misrepresentations and omissions

- 5 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

during the Class Period violated these specific requirements and obligations and caused Lead Plaintiff and members of the Class to purchase Alphatec common stock at artificially inflated prices, and to suffer losses proximately caused by the unlawful acts alleged herein.  Alphatec serves as a holding company for the operations of Alphatec Spine, Inc. ("Alphatec Spine").

19.   Defendant **HealthpointCapital Partners, L.P.** ("HCP I"), a Delaware limited partnership, beneficially owns 10,877,173 Alphatec shares. Defendant **HealthpointCapital Partners II, L.P.** ("HCP II"), also a Delaware limited partnership, beneficially owns 21,110,565 Alphatec shares.  The general partners of HCP I and HCP II, respectively, are HGP, LLC and HGP II, LLC. Together these entities (collectively, "Healthpoint") own and control approximately 38.1% of Alphatec's outstanding shares.  Healthpoint is a venture capital and private equity investor, specializing in companies producing orthopedic, spinal and dental devices and implants.  Healthpoint maintains its executive offices at 505 Park Avenue, 12th Floor, New York, New York 10022. Five of Alphatec's nine-member Board of Directors (Defendants Berkowitz, Foster, Hochschuler, Molson, and O'Neil) are beneficial owners of or affiliated with HealthpointCapital, LLC ("Healthpoint LLC"), which is the ultimate parent of Healthpoint.  Of these five, two (Defendants Molson and O'Neil) constitute Alphatec's Compensation Committee and thus control the compensation and continued employment of Alphatec's CEO, CFO and all other officers.  Based on these facts, Healthpoint is a controlling person of Alphatec within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

20.   Defendant **Mortimer Berkowitz, III** ("Berkowitz") has served as Chairman of Alphatec's Board of Directors since April 2007 and as a member of its Board of Directors since July 2005.  He is a managing member of HGP, LLC, and HGP II, LLC, and President, a member of the Board of Managers and a managing director of Healthpoint LLC.  He has held the positions at HGP, LLC

- 6 -

and HGP II, LLC since their formation in August 2002 and October 2005, respectively; the positions of managing director and member of the Board of Managers of Healthpoint LLC since its formation in July 2002; and the position of President of Healthpoint LLC since February 2005.  Berkowitz has a financial interest in HGP, LLC, HGP II, LLC and Healthpoint LLC and a direct limited partnership interest in Healthpoint.  Berkowitz signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

21.     Defendant **John H. Foster** ("Foster") has served as a member of Alphatec's Board of Directors since March 2005.  He is a former President and CEO of Alphatec and former Chairman of Alphatec's Board of Directors.  He is a managing member of HGP, LLC, and Chairman, CEO, a member of the Board of Managers and a managing director of Healthpoint LLC.  He has held the position with HGP, LLC since its formation in August 2002 and the positions with Healthpoint LLC since its formation in July 2002.  Foster has a financial interest in HGP, LLC, HGP II, LLC and Healthpoint LLC and a direct limited partnership interest in Healthpoint.   Foster signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

22.     Defendant **Dirk Kuyper** ("Kuyper") is Alphatec's President and CEO and a member of its Board of Directors.  Kuyper has been President and CEO since June 2007, and a Director since January 2008.  Kuyper signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

23.     Defendant **Peter C. Wulff** ("Wulff") served as Alphatec's Vice President, CFO and Treasurer from June 2008 until October 2010.  In October 2010, Wulff was removed and replaced as Alphatec's CFO and Treasurer.  Wulff signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

24.     Defendant **James R. Glynn** ("Glynn") has served as a member of

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 7 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

Alphatec's Board of Directors since May 2007.  Glynn signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

25.    Defendant **Stephen J. Hochschuler** ("Hochschuler") has served as a member of Alphatec's Board of Directors since October 2006 and as Chairman of its Scientific Advisory Board since October 2005.  Hochschuler is a clinical advisor of and consultant to Healthpoint LLC.  Hochschuler signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

26.    Defendant **Siri S. Marshall** ("Marshall") has served as a member of Alphatec's Board of Directors since October 2008.  Marshall signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

27.    Defendant **R. Ian Molson** ("Molson") has served as a member of Alphatec's Board of Directors since July 2005.  Molson is a member of Alphatec's Compensation Committee.  Molson also serves on the Board of Managers of Healthpoint LLC.  Molson has a financial interest in HGP, LLC, HGP II, LLC and Healthpoint LLC and a direct limited partnership interest in Healthpoint.  Molson signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

28.    Defendant **Stephen E. O'Neil** ("O'Neil") has served as a member of Alphatec's Board of Directors since July 2005.  O'Neil is the Chairman of Alphatec's Compensation Committee.  O'Neil has served on the Board of Managers of Healthpoint LLC.  He has a financial interest in HGP, LLC, HGP II, LLC and Healthpoint LLC and a direct limited partnership interest in Healthpoint.  O'Neil signed the false and misleading Registration Statement issued during the Class Period, as set forth below.

29.    Defendants Berkowitz, Foster, Kuyper, Wulff, Glynn, Hochschuler,

- 8 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

1   Marshall, Molson, and O'Neil are hereinafter referred to, collectively, as the
2   "Individual Defendants."

3       30.   Defendants Healthpoint, Berkowitz, Foster, Hochschuler, Molson,
4   and O'Neil are hereinafter referred to, collectively, as the "Healthpoint
5   Defendants."

6       31.   Defendant **Jefferies & Company, Inc.** ("Jefferies") acted as an
7   underwriter for shares issued pursuant to the false and misleading Registration
8   Statement and Prospectus, set forth below, within the meaning of the Securities
9   Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus
10  pursuant to which shares were sold to Lead Plaintiff and members of the Class.

11      32.   Defendant **Canaccord Adams Inc.** ("Canaccord") acted as an
12  underwriter for shares issued pursuant to the false and misleading Registration
13  Statement and Prospectus, set forth below, within the meaning of the Securities
14  Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus
15  pursuant to which shares were sold to Lead Plaintiff and members of the Class.

16      33.   Defendant **Cowen and Company, LLC** ("Cowen") acted as an
17  underwriter for shares issued pursuant to the false and misleading Registration
18  Statement and Prospectus, set forth below, within the meaning of the Securities
19  Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus
20  pursuant to which shares were sold to Lead Plaintiff and members of the Class.

21      34.   Defendant **Lazard Capital Markets, LLC** ("Lazard") acted as an
22  underwriter for shares issued pursuant to the false and misleading Registration
23  Statement and Prospectus, set forth below, within the meaning of the Securities
24  Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the Prospectus
25  pursuant to which shares were sold to Lead Plaintiff and members of the Class.

26      35.   Defendants Jefferies, Canaccord, Cowen, and Lazard are hereinafter
27  referred to, collectively, as the "Underwriter Defendants."   The Underwriter
28  Defendants served as underwriters and statutory sellers of the Offering and were

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 9 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

intimately involved in that Offering.   As underwriters, the Underwriter Defendants were responsible for the truth, accuracy and completeness of the documents pursuant to which the Offering was conducted.   The Registration Statement and Prospectus issued in connection with the Offering contained material untrue statements and omissions of material facts, as detailed below.

## V.     CLASS ACTION ALLEGATIONS

36.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of: (1) all those who purchased or otherwise acquired Alphatec common stock issued pursuant or traceable to the February 12, 2010 Registration Statement and April 16, 2010 Prospectus incorporated therein and were damaged thereby; and (2) all those who purchased or otherwise acquired the common stock of Alphatec between April 16, 2010 and August 5, 2010, inclusive (the "Class").   Excluded from the Class are the Defendants, their officers and directors at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Alphatec common stock was actively traded on the NASDAQ system.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Alphatec or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants'

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 10 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

wrongful conduct in violation of federal securities laws complained of herein.

39.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by the Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business and operations of Alphatec in violation of Rule 10b-5;

c.     whether Defendants acted willfully or with recklessness in connection with the misrepresentations alleged herein;

d.     whether the price of Alphatec common stock was artificially inflated during the Class Period;

e.     whether the documents issued in connection with the Offering contained untrue statements of material fact or omitted to disclose material facts in violation of the Securities Act; and

f.     to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

class action.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   Background of the Acquisition

42.   Defendant Alphatec describes itself as "[A] medical device company that designs, develops, manufactures and markets products for the surgical treatment of spine disorders, primarily focused on the aging spine. The Company's mission is to combine world-class customer service with innovative, surgeon-driven design that will help improve the aging patient's quality of life."

43.   For several years prior to the beginning of the Class Period, Alphatec's controlling shareholder, Healthpoint (which owned 38.1% of Alphatec), also owned a controlling interest Scient'x. Healthpoint first acquired an interest in Scient'x in June 2004, when it paid $28 million for a 33% interest. Healthpoint purchased an additional 61% interest in Scient'x in November 2007 for approximately $111 million, making Scient'x's valuation as of November 2007 approximately $185 million.

44.   Prior to the Class Period, Alphatec and Scient'x were losing money. For the nine months ending September 30, 2009, Alphatec incurred a net loss of $11.97 million and Scient'x incurred a net loss of $10.17 million. By late 2009, Healthpoint, which owned nearly 95% of Scient'x's outstanding shares, was interested in divesting itself of Scient'x, even at a loss.

45.   Defendants Berkowitz and Foster used their controlling interests in Alphatec to compel the Company's board to consider purchasing Scient'x. Alphatec had attempted a merger with Scient'x once before, in September 2006 (the deal had put a valuation on Scient'x of $171 million), but abandoned the idea in favor of entering licensing agreements with Scient'x. In January 2007, Alphatec entered agreements to sell several Scient'x products. However, just over a year later in April 2008, Alphatec cancelled the agreements and returned the products to Scient'x.

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

46.     Nevertheless, in the latter part of 2009, Defendant Berkowitz began to engineer a sale of Scient'x to Alphatec in the hopes of allowing Healthpoint to escape any further losses on its investment in Scient'x.  Berkowitz and Foster negotiated a deal whereby Alphatec would issue 24 million new shares, thus paying nothing in cash for its acquisition of Scient'x.

47.     On December 17, 2009, Alphatec announced that it had entered into a definitive agreement to acquire Scient'x in a transaction comprised entirely of Alphatec shares.

48.     Under the terms of the acquisition agreement, 100% of Scient'x outstanding stock would be exchanged for 24 million shares of Alphatec common stock.  The stock was worth approximately $118 million.  This was roughly $20 million less than Healthpoint had paid in cash for its Scient'x investments in 2004 and 2007, $53 million less than Alphatec would have paid for Scient'x had the merger gone forward in September 2006, and $67 million less than the company had been valued at in November 2007.

49.     Following the acquisition, Healthpoint would receive Alphatec shares in exchange for its Scient'x shares and become a 55% owner of Alphatec.

50.     In a press release announcing the deal, Alphatec stated that its acquisition of Scient'x would benefit Alphatec because the acquisition:

- "Increases scale and global presence in all major geographic markets";

- "Provides cross-selling opportunities in major markets to leverage future growth across core spine products and Aging Spine products"; and

- "Strengthens and expands the Company's product portfolio with differentiated products in all segments."

51.     In particular, in its proxy solicitation materials filed with the SEC on December 18, Alphatec touted the acquisition as leveraging Scient'x's "broad

- 13 -

global distribution network" including a market presence in 52 countries and 180 sales representatives worldwide.   According to Defendants, the "Scient'x distribution in 50+ countries" would "effectively increase[] [sales] opportunity by over 14x."

**B.   <u>Revenue Forecast for the Acquisition</u>**

52.   In its December 17, 2009 press release, Alphatec further stated that, subject to shareholder approval, "the transaction is currently expected to close by the end of the first quarter of 2010 . . . ."   Defendants then announced "expect[ed] 2010 *pro forma* full-year revenues to be in a range of $220 million to $225 million, and *pro forma* full-year 2010 adjusted [earnings before deduction of interest, taxes, and amortization ("EBITDA")] to be in a range of $32 million to $35 million."

53.   Notably, in 2009, Scient'x generated revenues of $51.8 million and Alphatec earned revenues of $132 million.  Thus, the entities' combined revenue for 2009 was $183.8 million. The 2010 revenue forecast for the two companies, once joined, added $36 to $41 million to this number, requiring over 20 percent growth to meet revenue forecasts.

54.   This revenue forecast was particularly aggressive in light of the pricing pressures facing the U.S. and European spine markets, which were steadily increasing in 2009 such that both Scient'x and Alphatec had incurred net losses for the first three quarters of 2009.

55.   Moreover, during a December 17, 2009 conference call with investors to discuss the Scient'x transaction which occurred after the close of the market that day, Defendant Kuyper emphasized those revenue figures (which represented year-over-year growth of over 20%) would result from the sheer scale of the two combined companies,  and "exclud[ed] any potential cross-selling revenue synergies."

56.   Defendant Kuyper further stated that, given the shared ownership

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 14 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

and the two companies' intimate knowledge of each other's business, the integration process could be expected to run smoothly, stating in this regard, "given each company's history and ownership, we believe that both Alphatec and Scient'x are based on shared values and ethos.  Based on the inherent knowledge each company has of the other, we do not expect any surprises to delay the integration process."

57.   Also during the December 17 conference call, Alphatec management repeatedly emphasized that the Company would realize "immediate" benefits from the acquisition.  For example, Defendant Wulff stated "[w]e expect immediate benefits from synergies that we have in SG&A and certain operational elements within the U.S. operations here."  Defendant Kuyper stated that "[t]he acquisition provides immediate cross selling opportunities and significant cost synergies that we intend to capitalize on immediately upon closing the transaction."

C.   **Just Prior to the Acquisition, Defendants Reaffirmed Revenue Forecasts for 2010 and that the Integration Would See Immediate Results**

58.   In Alphatec's February 23 earnings press release, the Company reaffirmed its previously-issued 2010 guidance, again projecting "annualized *pro forma* revenues of $220.0 million to $225.0 million, $32.0 million to $35.0 million in annualized adjusted EBITDA and positive non-GAAP EPS for the full year 2010, excluding amortization of intangible assets, transaction expenses and acquisition-related restructuring charges."

59.   During the Company's earnings call with analysts that same day, Defendant Kuyper stated with respect to the integration of Scient'x:

> We've been obviously preparing for the integration and the idea is to hit the ground running.  So, we've certainly tried to get ready for that.  We have a significant sales training planned over the next few months as soon as the

- 15 -

CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

close occurs and a lot of activity.  So, we've been getting really geared up in terms of being ready for the integration.  ***So, as soon as the deal closes, we can hit the ground running and realize the synergies very quickly***.[1]

**D.**   **Defendants Announce Completion of the Acquisition**

60.    On March 29, 2010 Alphatec announced its completion of the Scient'x acquisition and again reiterated that "the Company anticipates *pro forma* revenues for 2010 to be in a range of $220 million to $225 million, and *pro forma* full-year 2010 adjusted EBITDA to be in a range of $32 million to $35 million."

61.    Two weeks later, on April 12, 2010, the Company released its preliminary financial results for the first quarter ended March 31, 2010, boasting that it expected to report "record consolidated quarterly revenues of approximately $38.4 million" representing an increase of 25.6% from the first quarter 2009, and a sequential increase of 5.0% over fourth quarter 2009.   At the same time, it once again reaffirmed its previously-issued 2010 revenue and earnings guidance.

62.    Significantly, based on Alphatec's first quarter financial results, in order to attain its forecasted revenues for 2010, ***Alphatec would need to generate an additional $182 to $187 million***.  Yet, again, it reaffirmed its prior forecasts.

**E.**   **Materially False and Misleading Statements and Omissions in the Offering and During the Class Period**

63.    Amidst news of Alphatec's first quarter results, Alphatec also announced the Offering, in which Alphatec and Healthpoint would each sell 8 million shares of Alphatec common stock, plus an additional $1.2 million in over-allotments, for total proceeds of $46 million each.  In doing so Alphatec solicited investors, in essence, to finance the Scient'x acquisition.

---

[1]      Unless otherwise indicated, emphasis has been added throughout.

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

64.    On April 16, 2010 at the start of the Class Period, Alphatec filed a prospectus and prospectus supplement for the Offering (the "Prospectus"), pricing the shares at $5.00.   The Prospectus was incorporated into the Company's registration statement on Form S-3 (the "Registration Statement"), which was previously filed with the SEC on February 12, 2010 and declared effective on April 9, 2010.   The Prospectus repeated the so-called "benefits" to shareholders of the Scient'x acquisition, outlined in ¶ 50 above, and included the following representation:

> ***We have already begun to realize synergies from the Scient'x acquisition***. …. In addition, we expect to achieve up to $5 million in cost savings in 2010 by reducing overlapping operations of the two companies.
>
> ***In addition, we anticipate that our revenues throughout the balance of 2010 will continue to grow***, *driven by the inclusion of Scient'x revenues, cross-selling opportunities between Alphatec and Scient'x, the increased global scale of our distribution and marketing efforts*, and the approval and launch of up to 15 innovative products into the U.S. and/or E.U. markets.

65.    Defendants' statements in the immediately preceding paragraph were materially false and misleading when made in that:

> a.   Defendants' statement that the Company had "already begun to realize synergies" failed to disclose that the integration of the two companies was experiencing delays and not proceeding as planned;
>
> b.   Defendants' statement that revenues in 2010 "will continue to grow, driven by the inclusion of Scient'x revenues" failed to disclose that two-thirds of Scient'x's U.S. distributors overlapped with Alphatec's distributors, resulting in a revenue dyssynergy; and
>
> c.   Defendants falsely stated that the Company's "revenues throughout the balance of 2010 will continue to grow," when in

- 17 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

fact the Company's revenues had already been and would continue to be impacted by a variety of factors, including that

    i. pricing pressures in the U.S. and Europe had increased and were steadily increasing, limiting Alphatec's ability to achieve significant revenue growth in 2010;

    ii. Defendants had engaged in channel stuffing prior to the acquisition, which made Scient'x's sales appear greater than they actually were prior to the acquisition, and limited its ability to generate revenue following the acquisition;

    iii. Defendants misrepresented the growth that could come from using the same distribution networks to sell both Alphatec and Scient'x products;

    iv. Alphatec could not create significant growth from "cross-selling opportunities" for Scient'x's products; indeed, Alphatec had previously attempted to sell Scient'x's products through licensing agreements, including beginning in January 2007, but ultimately terminated the agreements in April 2008 and returned products to Scient'x; and

    v. by April 16, it was readily apparent that there were delays in integrating Alphatec's and Scient'x's computer systems, two-thirds of Scient'x's distributors overlapped and would have to be cut, and in the second quarter of 2010, international distributors were indicating an unwillingness to accept some of the Company's products.

66. The Offering was completed on April 21, 2010 with Alphatec and Healthpoint each selling 9.2 million Alphatec shares (with over-allotments) for

gross proceeds of approximately $46 million.

67.     On April 16, 2010, the Company's stock traded on a volume of nearly 4.9 million shares – the largest trading volume until the volume accompanying the end of the Class Period drop – to close at $5.73 on April 16, 2010.  Moreover, Alphatec's stock price reached a class period high on April 28, 2010, closing at $7.32.

68.     The following month, on May 10, 2010, Alphatec released first quarter results in line with preliminary results it had reported on April 12, 2010 *before* it consolidated Scient'x's financial results with its own.  At that time, Defendant Kuyper used the opportunity to tell investors that he was *"pleased with the progress"* the Company had made with the U.S. integration of Scient'x into Alphatec Spine.

69.     Kuyper reported that "*[a]s of April 30th, Scient'x's U.S. operations have been consolidated into Alphatec Spine*, *and we remain on track to realize at least $5 million of savings by eliminating redundancies in Scient'x's operating expenses*."

70.     Importantly, Alphatec management gave no hint of any weakness or problems either in its business or the integration process, but instead indicated that it still expected to achieve its previously-issued revenue and earnings guidance for 2010.

71.     The statements in ¶¶ 64 and 68-70, which caused Alphatec's securities to trade at artificially inflated prices, were each materially false and misleading when made and were known by Defendants to be false at that time for the following reasons, among others:

        a.   Defendants falsely represented on April 16, 2010 and again on May 10, 2010 that the acquisition was proceeding as planned, that they were "pleased with the progress" the Company had made with the integration of Scient'x into Alphatec, and that the

- 19 -

Company was "on track to realize at least $5 million of savings by eliminating redundancies in Scient'x's operating expenses" when, in fact, Defendants knew the integration was behind schedule due to operating system delays that would cause a material shortfall in Alphatec's forecasted revenue for 2010; and

b. Defendants falsely represented on April 16, 2010 and again on May 10, 2010 that revenues and EBITDA would continue to grow following the acquisition, reaching $220 million and $32 million, respectively, when, in fact, they knew that such results were not attainable, because:

i. pricing pressures in the U.S. and Europe had increased and were steadily increasing limiting Alphatec's ability to achieve revenue growth in 2010;

ii. Defendants had engaged in channel stuffing prior to the merger which made Scient'x's sales appear greater than they actually were, and limited its ability to generate revenue following the acquisition;

iii. Defendants misrepresented the growth that could come from using the same distribution networks to sell both Alphatec and Scient'x products;

iv. Defendants had eliminated one of the Company's Asian distributors in the first quarter of 2010, which reduced annual revenues by $10 million and made the revenue forecast even less attainable;

v. Alphatec could not create significant growth from selling Scient'x's products; indeed, Alphatec had previously attempted to sell Scient'x's products through licensing agreements, including beginning in January 2007, but

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

1    ultimately terminated the agreements in April 2008 and

2    returned products to Scient'x; and

3         vi.  by May 10, the acquisition had been closed for over a

4         month, and it had become readily apparent that there were

5         delays in integrating Alphatec's and Scient'x's computer

6         systems, two-thirds of Scient'x's distributors had been cut,

7         and in the second quarter of 2010, international

8         distributors were indicating an unwillingness to accept

9         some of the Company's products.

10        72.    During the Company's earnings call with analysts on May 10,

11   Defendant Kuyper did acknowledge that Alphatec was seeing "increased pricing

12   pressure in the U.S. market," but confidently reported that the Scient'x

13   acquisition, coupled with upcoming product launches, would offset the negative

14   pricing environment, stating in this regard:

15        The novel products that we have launched or plan to
          launch realize premium prices, offsetting broader market
16        related price declines. ***We're also in a unique position
          to leverage our production capacity to reduce costs and***
17        ***maintain margins over the long-term, offsetting any***
          ***potential negative pricing trends.*** Many of the products
18        we were introducing such as ILLICO SE, Solus, GLIF,
          ProFUSE, and the ELA Stem Cell offer cost advantages
19        to the hospital by way of operating room efficiencies,
          reductions in actual cost, or improved outcomes.
20

21        73.    The foregoing statements, which caused Alphatec securities to trade

22   at artificially inflated prices, were each materially false and misleading when

23   made, and were known by Defendants to be false at that time, because:

24        a.  Alphatec's profitability had already been and would continue to

25        be negatively affected by pricing pressures in the spine product

26        market, and the Company's "novel products" and "production

27        capacity" were insufficient to offset those pressures in 2010; and,

28        b.  by May 10, the acquisition had been closed for over a month, and

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 21 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

it had become readily apparent that there were delays in integrating Alphatec's and Scient'x's computer systems, two-thirds of Scient'x's distributors had been cut, and international distributors were unwilling to accept some of the Company's products which would materially impact Alphatec's ability to attain forecasted revenues.

74.     During the May 10 call, Alphatec management was also questioned about its rumored divestiture of a Japanese distributor, and Defendant Wulff assured investors that the divestiture and attendant revenue loss had also been "baked . . . into" the Company's 2010 guidance, as illustrated in the following exchange:

> Q:     **Raj Denhoy**: Okay.  Then just one last one.  I guess there was some talk about a Japanese distributor you were potentially going to be divesting.  Is that still something that's in the works?
>
> A:     **Peter C. Wulff**:   Yes.   That's actually been accomplished and that should substantially help our margins going forward.
>
> Q:     **Raj Denhoy**: What's the revenue offset though, in Asia-Pacific?
>
> A:     **Peter C. Wulff**:   The revenue offset is about $3 million.  But realize that was at virtually no margin.  So, we kept the spine revenue.  It's all the non-spine that we got rid of and so actually net-net, it's going to have a positive impact.
>
> Q:     **Raj Denhoy**:  On the margin side.  But from a revenue basis, that's 3 million a quarter we should assume is coming out of Asia-Pacific?
>
> A:     **Peter C. Wulff**:   The total reported last year is about $10 million in top line revenue.  The bottom line was negligible in net profit or even very low gross margin.  We've baked this into our financial guidance for revenues this year, Raj, and we expect the offset to be in the sales improvements both in the United States and in Europe.

75.     Defendants' statements in the immediately preceding paragraph were materially false and misleading when made and were known by Defendants to be false at that time, or were made with reckless disregard for the truth,

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

because they failed to disclose that Alphatec planned to dispose of its Asian distributor, which produced $10 million in annual revenues, without any realistic plan to replace those lost revenues, thereby having a material impact on its projected revenues for 2010.  Contrary to Defendants' statements, Defendants were aware at this point, midway through the second quarter, that this revenue loss would not be offset by "sales improvements both in the United States and in Europe."

## F.    The Truth Emerges

76.    On August 5, 2010, Alphatec stunned investors by reporting second quarter results that were substantially below expectations and slashing its 2010 guidance by 24% and projecting revenues of just $177 million to $182 million (down $43 million from prior projections of $220 to $225 million).

77.    Alphatec management blamed the reduction on "price pressure in core markets, unpredictability of product approvals with the FDA, as well as the complexities associated with integrating an international organization into Alphatec Spine."  During the Company's quarterly earnings call with analysts, Defendant Kuyper finally revealed that, contrary to earlier representations, the integration of the two companies' U.S. operations had not gone as planned:

> We have made tremendous progress in integrating Scient'x into Alphatec Spine in the second quarter.  We have previously stated we completed the U.S. consolidation, realizing significant cost savings and have commenced initial integration of the international operations.  ***It did take longer than anticipated to get Alphatec products loaded in Scient'x's international distribution system, and for us to get Scient'x products loaded into Alphatec's U.S inventory.***
>
> ***There was a great deal of complexity involved in loading thousands of new SKU's into each respective format, and this process took longer than we previously anticipated***.  It's since been resolved, and we are invoicing and shipping products across the entire organization.
>
> ***Separately, we saw an unanticipated slowdown in orders from our international distribution partners of***

*Scient'x products from historical levels during the second quarter.* We believe this to be temporary, as some distribution agents held back purchases until we clearly explained our consolidated products' strategy going forward.

78. When pressed for details concerning the reasons for the second quarter shortfall, *Defendant Kuyper blamed the shortfall almost entirely on the failed integration*, downplaying the impact of the failure to obtain product approvals from the FDA. Kuyper stated:

> [w]e underestimated the complexity in getting the Scient'x product loaded into Alphatec and vice-versa; Alphatec product loaded into Scient'x. *It took us about six weeks longer than we had originally estimated, and it really – we're talking about thousands of SKUs, completely different platforms and numbers that had nothing in common. So we had to work through that. So we think we lost about six weeks of productivity that way. So that certainly had an impact*.

79. The weak second quarter results and dramatic reduction in the Company's 2010 financial guidance, as well as the fact that the purported reasons for both were so completely at odds with management's prior representations, caught investors off guard.

80. One analyst described the large revenue shortfall as "*all the more troubling as Alphatec gave guidance on May 10, half way through the second quarter*." Denhoy also noted that the $8 million second quarter revenue miss was due in part to "the discontinuation of a Japanese distributor that wasn't previously communicated (~$3mn)" and, more troublingly, to channel stuffing by Scient'x prior to the acquisition. With respect to the latter, Denhoy stated, "[c]onfounding the result in Europe is indication that there may have been some stocking in Europe prior to Alphatec acquiring Scient'x, which could have overstated the run rate there and also created an air pocket of demand in Europe in Q2." Denhoy concluded:

> It is troubling to have such a sharp reset in expectations, especially when the reset is driven primarily by what appear to be a number of internal issues rather than by

- 24 -

CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

underlying market demand changes.

81.     The Company's August 5 announcement led to a sharp selloff of Alphatec shares, which plunged 46% to close at $2.39 on August 6, on volume of 13.2 million shares in stark contrast to its average daily trading volume of approximately 224,000 shares.  This represented a loss of shareholder value of over $177 million in one trading day.

82.     Following the Class Period, on October 11, 2010, Alphatec announced the removal of Defendant Wulff as CFO and Treasurer and his transition to the newly-created position of Senior Vice President, Strategic Initiatives.  On November 8, 2010, Alphatec further lowered its 2010 revenue guidance to between $170 and $172 million, a full $50 million beneath the $220 to $225 million forecasts that had been floated until August 2010.

## VIII. DEFENDANTS' SCIENTER CONCERNING ALPHATEC'S INABILITY TO MEET REVENUE FORECASTS DURING THE CLASS PERIOD

### A.     Defendants Knew Pricing Pressures in the Spine Industry Would Affect Alphatec's Ability to Attain Forecasted Revenue for 2010

83.     Pricing pressures in the spine industry were well known to Defendants.  Even before the Class Period, Defendants were attuned to the impact of pricing pressures on sales revenue.  In a January 13, 2009 conference call to discuss preliminary full-year 2008 financial results, for example, Defendant Kuyper noted "aggressive pricing pressure from [] customers trying to get discounts."

84.     Additionally, pricing pressures in the spine industry were discussed at conferences one or more Defendants attended.  Pricing pressures were discussed at the annual meeting of the North American Spine Society in San Francisco, California (the "NASS Meeting"), for example.  Defendants Kuyper

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

and Wulff attended the NASS Meeting, where they hosted a breakfast for analysts and investors.  Pricing pressures were likewise discussed at an American Academy of Orthopedic Surgeons meeting in early March 2010 and at a Spine Arthroplasty Society meeting in April 2010.  Defendant Hochschuler is an active member of the former and a founding member of the board of the latter, and, upon information and belief, attended their conferences on behalf of Alphatec.

85.    Alphatec hires and maintains contracts and pricing analysts to monitor pricing and, in particular, payments by third-party payers such as hospitals and insurance companies.  Upon information and belief, Alphatec's Vice President of Sales, in collaboration with the CEO and CFO, was responsible for formulating forecasts based on sales revenue.

86.    In certain of its SEC filings, Alphatec discussed pricing pressures in the spine industry.  A prospectus supplement dated February 10, 2010 and a 10-K dated March 2, 2010, for example, contained the following paragraph:

> **Consolidation in the healthcare industry could lead to demands for price concessions or to the exclusion of some suppliers from certain of our markets, which could have an adverse effect on our business, financial condition or results of operations.**
>
> Because healthcare costs have risen significantly over the past decade, numerous initiatives and reforms initiated by legislators, regulators and third-party payors to curb these costs have resulted in a consolidation trend in the healthcare industry to create new companies with greater market power, including hospitals. As the healthcare industry consolidates, competition to provide products and services to industry participants has become and will continue to become more intense. This in turn has resulted and will likely continue to result in greater pricing pressures and the exclusion of certain suppliers from important market segments as group purchasing organizations, independent delivery networks and large single accounts continue to use their market power to consolidate purchasing decisions for some of our customers. We expect that market demand, government regulation, third-party reimbursement policies and societal pressures will continue to change the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers, which may reduce competition, exert further downward

CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

pressure on the prices of our products and may adversely impact our business, financial condition or results of operations.

87.     This language was absent, however, from the April 16, 2010 Prospectus for the Offering.    Indeed, as noted above, Defendants assured investors during a May 10, 2010 conference call – halfway through the second quarter of 2010 – that the Company's "novel products" "offer[ed] cost advantages to the hospital by way of operating room efficiencies, reductions in actual cost, or improved outcomes," and were therefore immune from pricing pressures.

88.     Had Lead Plaintiff and Class members known the true nature of the pricing pressures the Company faced, they would not have made their investments.    Defendants' knowing disregard of pricing pressures throughout the Class Period proximately caused Lead Plaintiff's and Class members' losses.

**B.     Defendants Knew that Revenue from Global Sales Would Be Insufficient to Meet Revenue Forecasts**

89.     Pricing pressures in 2009 and the first half of 2010 had rendered Alphatec's U.S. sales volume relatively flat compared to the growth predicted for 2010:

U.S. Sales Revenue (in millions):

| | |
|---|---|
| 1Q09 | $23.8 |
| 2Q09 | 26.4 |
| 3Q09 | 26.1 |
| 4Q09 | 28.3 |
| 1Q10 | 28.4 |
| 2Q10 | 29.3[2] |

90.     Accordingly, Defendants knew, even before the Class Period began, that U.S. sales volume was not increasing at anywhere near the rate required to

---

[2]     The Company's results of operations included the results of operations of Scient'x beginning with the second quarter of 2010.

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

attain Defendants' wildly positive 2010 forecasts of revenue between $220 and $225 million and EBITDA of $32 to $35 million, indicating that growth had to come largely from Scient'x's European markets.

91.   Defendants, however, were intimately familiar with Scient'x's business and products and knew their limitations.   Indeed, on December 17, 2009, during Alphatec's conference call with investors, Defendant Kuyper touted the two companies' "inherent knowledge of each other."   This was especially true in light of Alphatec's and Scient'x's common officers and directors, common ownership, and shared distributors.   Indeed, in September 2006, Alphatec had first explored the possibility of merging with Scient'x, and in January 2007, Alphatec entered into license agreements to sell Scient'x's products; just over a year later, however, in April 2008, Alphatec terminated the license agreements and returned the unsold products to Scient'x.   As Defendants also knew at least by the beginning of the Class Period, Scient'x's distributors were hesitant to accept Alphatec's products or to work with Alphatec.   Given Defendants' knowledge of both companies' business and financial condition, it was misleading for Defendants to inform investors during the Class Period that Scientx's losses, when combined with Alphatec's losses, would be miraculously transformed into profits.

92.   In particular, for 2009, Alphatec incurred a net loss of over $13 million and Scient'x incurred a net loss of over $17 million.   Alphatec's 2009 revenues were $132 million and Scient'x's revenues were $51.8 million.   Thus, the two companies' combined revenue was merely $183.8 million.

93.   Notwithstanding combined revenue of $183.8 million for 2009 and each party's complete knowledge of the other's business, Defendants knowingly forecast 2010 revenue of between $220 and $225 million, an increase in revenue of over 20 percent.

94.   Defendants knew, when they repeated their 2010 revenue forecast

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

during the Class Period, that, particularly in light of the pricing pressures Alphatec already faced in the U.S. markets, income from Scient'x's global markets – which had suffered a loss of over $17 million in 2009 – would be insufficient to bring the Company anywhere close to the revenue of $220-225 million and EBITDA of $32-35 million Defendants forecast.

95.     Further, as Defendants knew during the Class Period, it would take time to integrate Scient'x into Alphatec, and Scient'x's global markets – even if they were open to Alphatec's existing products – would not immediately generate revenue for the Company.  Indeed, Defendants knew, at least by the beginning of the Class Period, that Scient'x's distributors were holding off on orders from the Company which would materially impact Alphatec's 2010 revenues.

96.     Finally, Defendants ignored a basic fact about the spine industry: buyers are limited.  Hospitals do not stock large quantities of spine technology; indeed, the technology and surgery required to implant it are among the most expensive of any medical procedure.  Alphatec could not realistically expect that supplying new products in markets already served by Scient'x would result in substantially higher revenue.  Rather, buyers might simply substitute one product with another.

C.     **Defendants Knew of Delays in Integration that Would Impact Alphatec's Ability to Achieve Forecasted Revenue**

97.     Defendants knew that Alphatec's acquisition of Scient'x would not result in immediate benefits and cost synergies, but, on the contrary, were well aware that there would be difficulties in integration.  In particular, Defendants knew, at least from the time the acquisition closed in March 2010, that integration of the two companies' computer systems would be problematic.  Throughout the Class Period Defendants knew that it was taking significantly

more time than planned to load product SKUs and set up the two companies to invoice and ship each other's products.

### D.   Additional Scienter Allegations Demonstrate that Defendants' Affirmations of Prior Revenue Forecasts During the Class Period Were Knowingly False When Made

#### 1.   Channel Stuffing

98.   Following the end of the Class Period, one analyst noted "stocking in Europe prior to Alphatec acquiring Scient'x, which could have overstated the run rate there and also created an air pocket of demand in Europe in Q2."  Such channel stuffing could only have been for the purpose of artificially inflating product demand, sales revenue and ultimately Alphatec's stock price.

#### 2.   Removal of CFO

99.   On October 11, 2010, Alphatec announced that Defendant Wulff had resigned his position as CFO and Treasurer.  The timing – only two months after Defendants' revenue forecast revision and the close of the Class Period – is further indicative of Defendants' scienter.

#### 3.   Motive

100.   Defendants each had strong financial incentives to inflate the price of Alphatec stock in anticipation of the Offering in April 2010.   They accomplished this by means of the materially false and misleading statements provided to and omissions kept from investors, as outlined above.   Indeed, Defendants Berkowitz, Foster, Molson, O'Neil, and Hochschuler (collectively with Healthpoint, the "Healthpoint Defendants") were beneficial owners and/or affiliates of Healthpoint LLC, the ultimate parent of Healthpoint, at the time of the acquisition.  Prior to Alphatec's acquisition of Scient'x, Healthpoint and its affiliates owned 94.8% of the shares of Scient'x.  Defendants Berkowitz, Foster, and Molson were also directors of Scient'x or an affiliate of Scient'x.

101.   In other words, the Healthpoint Defendants stood on both sides of

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

the Alphatec-Scient'x transaction and personally benefited from Scient'x's sale to Alphatec, receiving Alphatec shares as consideration for the sale. As consideration for its acquisition of Scient'x, Alphatec issued 24 million shares of stock; 22.75 million of those shares went to the Healthpoint Defendants.

102. In particular, at the time of the acquisition, (i) the Chairman of Alphatec's Board of Directors, Defendant Berkowitz, was a managing member of HGP, LLC and HGP II, LLC, the general partners of Healthpoint LLC. He was also President, a member of the Board of Managers and a managing director of Healthpoint LLC; (ii) Defendant Foster, a member of Alphatec's Board of Directors, was a managing member of HGP, LLC and the Chairman, CEO, a member of the Board of Managers and a managing director of Healthpoint LLC; and (iii) Defendants Molson and O'Neil also served on the Board of Managers of Healthpoint LLC. Defendants Berkowitz, Foster, O'Neil, and Molson had financial interests in HGP, LLC, HGP II, LLC, and Healthpoint LLC and direct limited partnership interests in Healthpoint. Defendant Hochschuler, a member of Alphatec's Board of Directors, was a clinical advisor of and a consultant to Healthpoint LLC.

103. For purposes of allocating shares transferred in the merger, Healthpoint on the one hand, and Defendants Berkowitz and Foster on the other, were indistinguishable. Shares listed in Alphatec's SEC filings as beneficially owned by HCP I or HCP II were also listed as beneficially owned by Berkowitz and Foster, and *vice versa*.

104. On March 10, 2010, as the acquisition was being finalized, Alphatec executive Stephen Lubischer, the Company's Vice President of Sales who provided input and figures used by Defendants to make the false and misleading statements noted above, sold 7,000 Alphatec shares at the above-market price of $7.00 per share, netting $49,000 in personal income.

105. Upon closing of the Scient'x acquisition, Defendant Molson

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

1  received options to purchase 45,000 shares of Alphatec stock.

2     106.  Following the acquisition, Healthpoint owned 55% of the

3  outstanding shares of Alphatec.  Seeking to convert their Alphatec shares to cash,

4  and thus, in essence, to use Alphatec shareholders to finance the Scient'x

5  acquisition after it had been consummated, Defendants engineered an Offering of

6  18.4 million shares of Alphatec stock.  Half of the $92 million raised in the

7  Offering ($46 million) went directly into the pockets of the Healthpoint

8  Defendants.   The other half went to Alphatec, in which the Healthpoint

9  Defendants owned a substantial stake.

10     107.  Healthpoint and Defendants Berkowitz, Foster, O'Neil, Molson, and

11  Hochschuler, because of their interests in Healthpoint and Alphatec, were

12  strongly motivated to inflate the value of Alphatec's stock, and thus the

13  consideration they were to receive in the Offering in April 2010.  Such a motive

14  indicates Defendants' fraudulent intent.

15     108.  Lead Plaintiff and the Class have suffered damages in that, in

16  reliance on the integrity of the market, they paid artificially inflated prices for

17  Alphatec common stock, and such prices declined when the truth was later

18  realized.   Lead Plaintiff and the Class would not have purchased Alphatec

19  common stock at the prices they paid, or at all, if they had been aware that the

20  market prices had been artificially and falsely inflated by Defendants' misleading

21  statements.

22  **VIII.  LOSS CAUSATION AND MARKET EFFICIENCY**

23     109.  These allegations establish loss causation for purposes of the

24  Exchange Act claims.

25     110.  Due to Defendants' wrongful conduct in deceiving investors and the

26  market through the fraudulent conduct alleged herein, Alphatec's shares were

27  artificially inflated at all times during the Class Period.  This inflation was the

28  result of Defendants' materially false and misleading statements and omissions

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 32 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

concerning Alphatec's ability to immediately integrate Scient'x and the projected revenue forecasted for Alphatec as a result of the acquisition.  However, the inflation in Alphatec's stock price dissipated as the truth concerning delays in the Scient'x integration and the causes of Alphatec's projected revenue shortfall were revealed to investors and the market.

111.   As a direct and proximate result of Alphatec's disclosures, which revealed the truth about Defendants' materially false and misleading statements or material facts that Defendants failed to disclose, Alphatec's shares fell to $2.39, a 46% decline in value, in a single trading day.  This massive drop caused Alphatec to suffer a market capitalization loss of $177 million accompanied by an extraordinary volume of trading.  Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth was realized.



112.   The timing and magnitude of the decline in the price of Alphatec

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendant's fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' scheme to artificially inflate the price of Alphatec common stock and the subsequent significant decline in the value of Alphatec common stock when the unexpected adverse facts were revealed.

113.   With respect to Lead Plaintiff's claims brought under the Exchange Act and Rule 10b-5, Lead Plaintiff is entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   the Company's securities traded in efficient markets;

d.   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.   without knowledge of the misrepresented or omitted material facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired Alphatec stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which time the price of Alphatec securities was inflated by Defendants' misrepresentations and omissions.

114.   At all relevant times, the market for Alphatec's common stock was an efficient market for the following reasons, among others:

a.   Alphatec common stock met the requirements for listing, and was

- 34 -

listed and actively traded, on the NASDAQ Global Select system, a highly efficient and automated market;

b.    as a regulated issuer, Alphatec filed periodic public reports with the SEC and the NASDAQ;

c.    Alphatec regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

d.    Alphatec was followed by numerous securities analysts employed by major brokerage firms including Jefferies & Company, Inc., Canaccord Genuity, Roth Capital Partners, LLC, and Life Science Analytics, Inc.

115.   As a result of the foregoing, the market for Alphatec common stock promptly digested current information regarding Alphatec from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Alphatec common stock during the Class Period suffered similar injuries through their purchases of Alphatec common stock at artificially inflated prices and a presumption of reliance applies.

## IX.    **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

116.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the statements pleaded herein were statements or representations about the Company's present status to which the statutory safe harbor does not apply.

117.   To the extent any of the statements pleaded herein may properly be classified as forward-looking statements to which the statutory safe harbor

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

applies: (a) those statements were not accompanied by meaningful cautionary statements identifying the important then present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (b) the particular speakers of such statements knew in each case that their statements were false or misleading, and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

118.   Any purported warnings contained in or accompanying any of the press releases, periodic financial reports and financial statements, offering materials and other statements described herein were generic and unparticularized boilerplate statements which lacked the meaningful cautionary language necessary to insulate any purportedly forward-looking statements.

## X.   <u>CLAIMS</u>

<u>FIRST CLAIM FOR RELIEF</u>
**Violation of Section 11 of the Securities Act**
**Against Defendants Alphatec, Berkowitz, Foster, Kuyper, Wulff, Glynn,**
**Hochschuler, Marshall, Molson, O'Neil, and the Underwriter Defendants**

119.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the Defendants to defraud Lead Plaintiff or members of the Class.   This Claim is predicated upon Defendants' strict liability for material misstatements and omissions in the Registration Statement and Prospectus for the Offering.   This Claim is brought pursuant to Section 11 of the Securities Act, on behalf of the Class, against Defendants Alphatec, Berkowitz, Foster, Kuyper, Wulff, Glynn, Hochschuler, Molson, Marshall, O'Neil, and the Underwriter Defendants.

120.   This Count is not based on and does not sound in fraud.   Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded

from this Count.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that Defendants acted with scienter or fraudulent intent.  Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

121.   The Registration Statement for the Offering, which incorporated the Prospectus for the Offering, was materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

122.   The Defendants named in this claim are strictly liable to Lead Plaintiff and members of the Class.  Lead Plaintiff and members of the Class suffered significant losses as a result of Defendants' materially false and misleading statements and omissions of material fact in the Registration Statement.

123.   Defendants Berkowitz, Foster, Kuyper, Wulff, Glynn, Hochschuler, Marshall, Molson, and O'Neil signed the Registration Statement on behalf of Alphatec.

124.   The Underwriter Defendants acted as underwriters in the sale of Alphatec's shares pursuant to the Registration Statement and helped to draft and disseminate the Registration Statement.

125.   The Defendants named in this claim owed Lead Plaintiff and other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

126.   Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true, without omissions of any material facts, and were not misleading.   Accordingly, Defendants acted negligently and are therefore liable to Lead Plaintiff and all other persons who purchased or otherwise acquired shares sold on the Offering.   As such, the Defendants are liable to the Class.

127.   The Defendants named in this claim issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of material misstatements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.

128.   By reason of the conduct alleged herein, each of the Defendants named in this claim violated Section 11 of the Securities Act.

129.   Lead Plaintiff and members of the Class acquired shares pursuant and/or traceable to the Registration Statement.   On April 16, 2010, Lead Plaintiff purchased (a) 18,440 shares in the Offering, at a price of $5.63 per share, from Canaccord; and (b) 40,760 shares in the Offering, at a price of $5.00 per share, from Jefferies.

130.   At the time they obtained their shares, Lead Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

131.   This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement.

132.   Lead Plaintiff and members of the Class have sustained damages. The value of their shares has declined substantially, subsequent to, and due to, the violations of the Defendants named in this claim.

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

133.   By virtue of the foregoing, Lead Plaintiff and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Defendants named in this claim.

## SECOND CLAIM FOR RELIEF
### Violation of Section 12(a)(2) of the Securities Act
**Against Defendants Alphatec, Healthpoint, and the Underwriter Defendants**

134.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

135.   This claim is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against Defendants Alphatec, Healthpoint, and the Underwriter Defendants.

136.   Defendants Alphatec, Healthpoint, and the Underwriter Defendants promoted and sold shares pursuant to the defective Registration Statement.

137.   This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that Defendants acted with scienter or fraudulent intent.  Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

138.   Plaintiff and members of the Class purchased shares from the Underwriter Defendants in the Offering.  On April 16, 2010, Lead Plaintiff purchased (a) 18,440 shares in the Offering, at a price of $5.63 per share, from Canaccord; and (b) 40,760 shares in the Offering, at a price of $5.00 per share, from Jefferies.

139.   The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 39 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

1   statements made not misleading, and concealed and failed to disclose material

2   facts.

3       140.   Defendants Alphatec, Healthpoint, and the Underwriter Defendants

4   owed to Lead Plaintiff and members of the Class who purchased shares pursuant

5   to the Registration Statement the duty to make a reasonable and diligent

6   investigation of the statements contained in the Registration Statement and

7   Prospectus, to ensure that such statements were true and that there was no

8   omission to state a material fact required to be stated in order to make the

9   statements contained therein not misleading.  Defendants Alphatec, Healthpoint,

10  and the Underwriter Defendants did not make a reasonable investigation or

11  possess reasonable grounds to believe that the statements contained and

12  incorporated by reference in the Registration Statement at the time of the

13  Offering were true and without omissions of any material facts and were not

14  misleading.   Accordingly, Defendants Alphatec, Healthpoint, and the

15  Underwriter Defendants are liable to Lead Plaintiff and the other members of the

16  Class who purchased Alphatec shares in the Offering.

17      141.  Lead Plaintiff and other members of the Class purchased or

18  otherwise acquired shares pursuant to and/or traceable to the defective

19  Registration Statement.  Lead Plaintiff and members of the Class did not know,

20  nor in the exercise of reasonable diligence could have known, of the untruths and

21  omissions contained in the Registration Statement and Prospectus.

22      142.  By reason of the conduct alleged herein, Defendants Alphatec,

23  Healthpoint, and the Underwriter Defendants violated Section 12(a)(2) of the

24  Securities Act.   Accordingly, Lead Plaintiff and members of the Class who

25  purchased shares pursuant to and/or traceable to the Registration Statement

26  sustained material damages in connection with their purchases of those shares.

27  Lead Plaintiff and other members of the Class who hold the shares issued

28  pursuant to the Registration Statement have the right to rescind and recover the

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 40 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

consideration paid for their shares, and hereby elect to rescind and tender their shares to Defendants Alphatec, Healthpoint, and the Underwriter Defendants. Class members who have sold their shares are entitled to rescissory damages.

143.   This claim is brought within three years from the time that the shares upon which this claim is brought were sold to the public, and within one year from the time when Lead Plaintiff and Class members discovered or reasonably could have discovered the facts upon which this claim is based.

## THIRD CLAIM FOR RELIEF
### Violation of Section 15 of the Securities Act
### Against Defendant Healthpoint and the Individual Defendants

144.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

145.   This count is asserted against Healthpoint and the Individual Defendants and is based upon Section 15 of the Securities Act.

146.   This Count is not based on and does not sound in fraud.   Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.   For purposes of asserting this claim under the Securities Act, Lead Plaintiff does not allege that Healthpoint and the Individual Defendants acted with scienter or fraudulent intent.   Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

147.   Healthpoint and the Individual Defendants, by virtue of his, her or its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of Alphatec and/or Healthpoint within the meaning of Section 15 of the Securities Act.   Healthpoint and the Individual Defendants had the power and influence and exercised the same to cause Alphatec and/or Healthpoint to engage in the acts

Cohen Milstein
Sellers & Toll
PLLC
Attorneys At Law

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

described herein.

148.    Healthpoint and the Individual Defendants at all relevant times participated in the operation and management of Alphatec, and conducted and participated, directly and indirectly, in the conduct of Alphatec's business affairs. As officers and directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alphatec's financial condition and results of operations. Because of their positions of control and authority as officers and directors of Alphatec, the Individual Defendants were able to, and did, control the contents of the Registration Statement and Prospectus, which contained materially untrue financial information, among other things.

149.    Healthpoint and the Individual Defendants' control, ownership and positions made them privy to and provided them with knowledge of the material facts concealed from Lead Plaintiff and members of the Class.

150.    By reason of the aforementioned conduct, Healthpoint and each of the Individual Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Lead Plaintiff and the other members of the Class who purchased or acquired shares pursuant to the Offering. As a direct and proximate result of the conduct of Alphatec, Healthpoint and the Individual Defendants, Lead Plaintiff and the other members of the Class suffered damages in connection their purchase or acquisition of shares pursuant to the Offering.

**FOURTH CLAIM FOR RELIEF**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against Alphatec, Kuyper, and Wulff**

151.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152.    During the Class Period, Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

- 42 -

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

153.   Defendants knew, but did not reveal to investors, that statements made during the Class Period regarding Alphatec's financial condition were materially false and misleading and/or omitted material information.   In particular, Defendants knew that the growth predicted by their financial forecasts could not be attained in light of pricing pressures, their inability to offset those pricing pressures with revenue from Scient'x's European markets, and delays in integration of Alphatec and Scient'x – all of which Defendants knew given their intimate familiarity with Scient'x's business, product line, and financial condition.

154.   Defendants' channel stuffing further indicates their scienter, as does Defendant Wulff's removal and replacement as Alphatec's CFO and Treasurer following the end of the Class Period.

155.   Finally, as set forth above, Defendants had a strong financial motivation to artificially inflate Alphatec's share price at the time of the Offering as half of those proceeds were immediately pocketed by the Healthpoint Defendants.

156.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Alphatec common stock, and such prices declined when the truth was later realized.   Lead Plaintiff and the Class would not have purchased Alphatec common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

157.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in

Cohen Milstein
Sellers & Toll
PLLC
Attorneys At Law

- 43 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

connection with their purchases of Alphatec common stock during the Class Period.

### FIFTH CLAIM FOR RELIEF
#### Violation of Section 20(a) of the Exchange Act
#### Against Healthpoint and the Individual Defendants

158.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

159.   Healthpoint and the Individual Defendants acted as controlling persons of Alphatec within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their stock ownership, board positions and/or control of compensation, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

160.   In particular, Healthpoint and the Individual Defendants each had direct and/or supervisory involvement in the operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   These Defendants culpably participated in the commission of the wrongs alleged herein.

161.   As alleged above, Alphatec violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, Healthpoint and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

- 44 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against the Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XI.    **<u>JURY DEMAND</u>**

To the full extent available, Lead Plaintiff demands a trial by jury.

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

COHEN MILSTEIN
SELLERS & TOLL
PLLC
ATTORNEYS AT LAW

Dated:        February 22, 2011           GLANCY BINKOW & GOLDBERG
                                          LLP


                                          By:  *s/ Lionel Z. Glancy*
                                               Lionel Z. Glancy (#134180)
                                               Michael Goldberg (#188669)
                                               1801 Avenue of the Stars, Suite 311
                                               Los Angeles, CA  90067
                                               Telephone: (310) 201-9150
                                               Facsimile:  (310) 201-9160
                                               Email: info@glancylaw.com

                                          *Liaison Counsel for Lead Plaintiff*

                                          COHEN MILSTEIN SELLERS &
                                          TOLL PLLC
                                               Steven J. Toll
                                               Julie Goldsmith Reiser
                                               S. Douglas Bunch
                                               1100 New York Avenue N.W.
                                               Suite 500, West Tower
                                               Washington, D.C. 20005
                                               Telephone: (202) 408-4600
                                               Facsimile:  (202) 408-4699
                                               Email: jreiser@cohenmilstein.com

                                          *Lead Counsel for Lead Plaintiff and the
                                          Class*

Cohen Milstein
Sellers & Toll
PLLC
Attorneys At Law

- 46 -

CORRECTED AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Roberto L. Peña, on behalf of the Fresno County Employees' Retirement Association ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed a class action complaint asserting securities claims on behalf of purchasers of Alphatec Holdings, Inc. ("Alphatec") common stock between December 18, 2009 and August 5, 2010, inclusive (the "Class Period") and wish to join as a plaintiff retaining Cohen Milstein Sellers & Toll PLLC as my counsel.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the securities that are the subject of this action were as indicated on Schedule A, attached hereto.

5.      In the three-year period preceding the date of this Certificate, Plaintiff sought to serve as a representative party on behalf of the class in *In re BP plc Sec. Litig.*, MDL No. 2185 (S. D. Tex.).

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of October 2010.

_Roberto L. Peña_

_____
Roberto L. Peña
Retirement Administrator

SCHEDULE A

| Date | Transaction Type | Shares | Price | |
|---|---|---|---|---|
| 4/16/2010 | Purchase | 18,440 | $ | 5.63 |
| 4/16/2010 | Purchase | 40,760 | $ | 5.00 |
| 4/27/2010 | Purchase | 49,945 | $ | 6.72 |

1

2

**PROOF OF SERVICE BY ELECTRONIC POSTING
<u>AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES</u>**

3

I, the undersigned, say:

4

5

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

6

7

On February 22, 2011, I caused to be served the following document on each ECF-registered party listed on the attached service list in the Action by posting such document electronically to the ECF website of the United States District Court for the Southern District of California:

8

9

**CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

10

and upon all others not so-registered:

11

See Attached Service list.

12

13

14

15

**By Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

16

17

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

18

Executed on February 22, 2011, at Los Angeles, California.

19

20

*s/Lionel Z. Glancy*
Lionel Z. Glancy

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:10-cv-01673-BEN -CAB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Z Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Steven Guggenheim**
  sguggenheim@wsgr.com,cphillips@wsgr.com

- **Michele Dianne Johnson**
  michele.johnson@lw.com,everett.bulthuis@lw.com,#ocecf@lw.com,jana.roach@lw.com

- **David Nathan Lake**
  david@lakelawpc.com

- **Nina F Locker**
  nlocker@wsgr.com,lkoontz@wsgr.com

- **Joni L. Ostler**
  jostler@wsgr.com,pbaird@wsgr.com

- **Julie G. Reiser**
  jreiser@cohenmilstein.com

- **Colleen Carlton Smith**
  colleen.smith@lw.com,kelli.moro@lw.com

- **Steven J Toll**
  stoll@cmht.com,efilings@cmht.com

- **Peter A. Wald**
  peter.wald@lw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`