FILED

2012 MAR 22  AM 10: 19

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE MALLEN, individually and on behalf of all others similarly situated; and FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, FCERA,<br><br>                                        Plaintiffs,<br><br>        vs.<br><br>ALPHATEC HOLDINGS, INC.; DIRK KUYPER; PETER C. WULFF; MORTIMER BERKOWITZ, III; HEALTHPOINT CAPITAL PARTNERS, LLP; HEALTHPOINT CAPITAL PARTNERS II, LLP; JOHN H. FOSTER; JAMES R. GLYNN; STEPHEN J. HOCHSCHULER; SIRI S. MARSHALL; R. IAN MOLSON; JEFFERIES & COMPANY, INC.; CANACCORD ADAMS INC.; COWEN AND COMPANY, LLC; LAZARD CAPITAL MARKETS, LLC; and STEPHEN E. O'NEIL,<br><br>                                        Defendants. | CASE NO. 10-cv-1673 – BEN (MDD)<br><br>ORDER GRANTING THE HEALTHPOINT DEFENDANTS', THE UNDERWRITER DEFENDANTS', AND THE ALPHATEC DEFENDANTS' MOTIONS TO DISMISS<br><br>[Doc. Nos. 41, 42, 44] |

This is a putative securities class action brought by Stephanie Mallen, individually and on behalf of all others similarly situated, seeking to recover for Defendants' alleged violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). In brief, Plaintiffs allege that Defendants engaged in a scheme to inflate the price of Alphatec Holdings, Inc., so that they could profit financially, by acquiring a rival company with the promise to

1   the investors that the acquisition would lead to immediate synergies and increased revenues. Over

2   several weeks following the acquisition, although integration delays and other setbacks were allegedly

3   becoming apparent, Defendants trumpeted the consolidated company's ability to meet the forecasted

4   revenue guidance. When the company finally announced that it had experienced certain setbacks and,

5   as a result, had to revise its revenue guidance by 15%, the stock price plummeted overnight.

6           Presently before the Court are motions to dismiss brought by three groups of Defendants: (1)

7   HealthpointCapital Partners, L.P., HealthpointCapital Partners II, L.P., Mortimer Berkowitz, III, John

8   H. Foster, R. Ian. Molson, and Stephen E. O'Neil (collectively, the "Healthpoint Defendants"); (2)

9   Canaccord Adams, Inc., Jefferies & Company, Inc., Cowen and Company, LLC, and Lazard Capital

10  Markets (collectively, the "Underwriter Defendants"); and (3) Alphatec Holdings, Inc., Dirk Kuyper,

11  Peter C. Wulff, Stephen J. Hochschuler, James R. Glynn, and Siri S. Marshall (collectively, the

12  "Alphatec Defendants"). Plaintiffs filed a consolidated opposition to the motions to dismiss, and

13  Defendants filed three separate reply briefs. Having considered the parties' arguments, and for the

14  reasons set forth below, the Court **GRANTS** the motions to dismiss.

15                                    **BACKGROUND**

16  **I.      Factual background**[1]

17          Defendant Alphatec is a publicly traded spinal implant company that designs, manufactures,

18  and markets products for the surgical treatment of spine disorders. Dirk Kuyper is Alphatec's

19  President and Chief Executive Officer ("CEO"). Peter Wulff is Alphatec's Senior Vice President and,

20  during the class period, was also Alphatec's Chief Financial Officer ("CFO") and Treasurer. Mortimer

21  Berkowitz, III is the Chairman of Alphatec's Board of Directors. Stephen E. O'Neil is the Chairman

22  of Alphatec's Compensation Committee. At all the relevant times, these four individual Defendants,

23  together with Defendants James Glynn, Siri Marshall, Stephen Hochschuler, III, John H. Foster, and

24  R. Ian Molson, made up Alphatec's nine-person Board of Directors.

25          Defendant Healthpoint is a research-based private equity firm that invests in orthopedic and

26  ─────────────────

27          [1] For purposes of resolving these motions to dismiss, the Court accepts as true all well-pleaded factual allegations in Plaintiffs' Corrected Amended Class Action Complaint ("CAC"). *See Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). This factual summary is taken in the light most

28  favorable to Plaintiffs. *See Number 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003).

1  dental device businesses. It is compromised of two limited partnerships, HealthpointCapital Partners,

2  L.P. and HealthpointCapital Partners II, L.P. Since March 2005, Healthpoint has been a substantial

3  investor in Alphatec. Defendants Berkowitz, Foster, Molson, and O'Neil are outside Alphatec

4  directors affiliated with Healthpoint, serving on Healthpoint's Board of Managers. Defendant

5  Hochschuler, another Alphatec director, serves as a medical consultant to Healthpoint.

6       This action arises out of Alphatec's acquisition of Scient'x, S.A., a French spinal products

7  company. Prior to the acquisition, Scient'x was Healthpoint's investment. In June 2004, Healthpoint

8  acquired a 33% interest in Scient'x, which it increased to 95% in November 2007. Plaintiffs allege

9  that Scient'x was an unprofitable investment for Healthpoint, and therefore Defendants Berkowitz and

10  Foster, who were simultaneously on Alphatec's Board of Directors and Healthpoint's Board of

11  Managers, orchestrated Healthpoint's sale of Scient'x to Alphatec. On December 17, 2009, Alphatec

12  announced that it had entered into a definitive agreement to acquire Scient'x for 24 million shares of

13  Alphatec common stock, valued at approximately $118 million.[2] (*See* Decl. of Colleen C. Smith ISO

14  Alphatec Defs.' MTD ("Smith Decl."), Exh. 7, at 182 [Doc. No. 44-3]; *see also* CAC ¶¶ 47-48 [Doc.

15  No. 24].) Alphatec announced the completion of its acquisition of Scient'x on March 29, 2010.

16  Following the acquisition, having exchanged its Scient'x shares for Alphatec shares, Healthpoint

17  became the majority stockholder of Alphatec with a 55% ownership interest.

18       In announcing the acquisition, Alphatec projected 2010 pro forma full-year revenues for the

19  combined company in a range of $220 million to $225 million, and pro forma full-year 2010 adjusted

20  earning before deduction of interest, taxes, and amortization ("EBITDA") in a range of $32 million

21  to $35 million (hereinafter, "2010 revenue guidance"). (Smith Decl., Exh. 7, at 182.) Alphatec

22  reaffirmed the 2010 revenue guidance on numerous occasions, including in its February 23, 2010

23  earnings press release; in its March 29, 2010 announcement of the completion of Scient'x acquisition;

24  in its April 12, 2010 announcement of preliminary first quarter 2010 results; and in its May 10, 2010

25  announcement of final first quarter 2010 results. On April 12, 2010, Alphatec released its preliminary

26  first quarter results, reporting quarterly revenues of approximately $38.4 million, an increase of 25.6%

27

28     [2] According to Plaintiffs, the value of Scient'x at acquisition was $53 million less than what Alphatec was prepared to pay for Scient'x in September 2006. (CAC ¶ 45.)

from first quarter 2009, and a sequential increase of 5.0% over fourth quarter 2009. (Decl. of Lionel Z. Glancy ISO Lead Pl.'s Opp. to Defs.' MTDs ("Glancy Decl."), Exh. 1, at 1-7 [Doc. No. 54-1].)

On April 16, 2010, the first day of Plaintiffs' alleged class period, Alphatec announced a public offering in which Alphatec and Healthpoint each would sell up to 9.2 million shares of Alphatec common stock. In the Prospectus Supplement announcing the offering, Alphatec stated, *inter alia*:

> On March 26, 2010, we completed the acquisition of Scient'x S.A., or Scient'x, a global medical device company based in France that designs, develops and manufactures surgical implants to treat disorders of the spine. Scient'x distributes products through its direct sales force in France, Italy and the U.K., and distributes products through independent distributors in more than 45 additional countries. . . .
>
> . . . .
>
> ***We have already begun to realize synergies from the Scient'x acquisition.*** Our OsseoFix Spinal Fracture Reduction System is now being sold in six countries and will be launched through Scient'x's direct sales organizations in France, Italy and the UK in the second quarter of 2010. We also expect to offer products in additional countries during 2010 as a result of our expanded international sales channel. As a result of the Scient'x acquisition we have also added 19 distribution agents in the U.S., which we believe represents an addition of approximately 40 sales representatives. In addition, we expect to achieve up to $5 million in cost savings in 2010 by reducing overlapping operations of the two countries.
>
> The combined entity has unaudited pro forma combined 2009 revenue of $182.4 million, reflecting approximately 25% year-over-year growth. Based on preliminary financial data, we expect to report record consolidated quarterly revenues for Alphatec Holdings, Inc. of approximately $38.4 million for the first quarter of 2010, an increase of 25.6% from the $30.6 million reported for the first quarter 2009, and a sequential increase of 5.0% over fourth quarter 2009 revenues of $36.6 million. These revenue results remain subject to review by our independent registered public accounting firm in accordance with Statement on Accounting Standards No. 100. We expect that our first quarter 2010 revenues will be the eleventh consecutive quarter of record revenues. ***In addition, we anticipate that our revenues throughout the balance of 2010 will continue to grow, driven by the inclusion of Scient'x revenues, cross-selling opportunities between Alphatec and Scient'x, the increased global scale of our distribution and marketing efforts,*** and the approval and launch of up to 15 innovative products into the U.S. and/or E.U. markets.

(Smith Decl., Exh. 13, at 703.)[3] The Prospectus was incorporated into the Registration Statement previously filed with the Securities Exchange Commission ("SEC") on February 12, 2010. The offering closed on April 21, 2010, with Alphatec and Healthpoint each selling 9.2 million shares at

---

[3] Hereinafter, unless otherwise noted, ***bold italic emphasis*** has been added to highlight the specific statements challenged by Plaintiffs in this action as false or misleading. Moreover, while the allegations are taken out of the CAC, the Court also relies on the documents filed with the SEC and the transcripts of the conference calls for full quotations of the challenged statements. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (proper to consider full text of the prospectus when ruling on a motion to dismiss, including portions not mentioned in the complaint).

1   $5.00 per share, for a total of $46 million each.  None of the individual Defendants sold any shares

2   during the offering.  As a result of the April 16, 2010 offering, Healthpoint's ownership interest in

3   Alphatec decreased from 55% to 38.1%.  (*See* CAC ¶ 19.)

4         On May 10, 2010, Alphatec announced its formal results for the first quarter, confirming

5   revenue of $38.4 million and a 25.6% year-over-year revenue growth.  (Smith Decl., Exh. 14, at 765.)

6   Alphatec also reaffirmed its 2010 revenue guidance.  (*Id.*, Exh. 14, at 767.)  In the announcement, Mr.

7   Kuyper stated: "Lastly, I am ***pleased with the progress*** we have made with the US integration of

8   Scient'x into Alphatec Spine.  ***As of April 30th, Scient'x's US operations have been consolidated***

9   ***into Alphatec Spine, and we remain on track to realize at least $5 million of savings by eliminating***

10   ***redundancies in Scient'x's operating expenses***."  (*Id.*, Exh. 14, at 766.)  During the conference call

11   with the analysts the same day, Mr. Kuyper admitted that Alphatec was "seeing increased price

12   pressure in the US market as hospitals try to decrease their costs and control the number of vendors

13   they deal," but was optimistic that this represented a "significant opportunity" for Alphatec to

14   "effectively compete for hospital contracts." (*Id.*, Exh. 16, at 825.)  Specifically, Mr. Kuyper stated:

15           The novel products that we have launched or ***plan to launch realize premium***
        ***prices, offsetting broader market related price declines.  We're also in a unique***

16           ***position to leverage our production capacity to reduce costs and maintain margins***
        ***over the long-term, offsetting any potential negative pricing trends***.  Many of the

17           products we were introducing such as Illico SE, Solis, GLIF, ProFUSE, and the ELA
        stem cell offer cost advantages to the hospital by way of operating room efficiencies,

18           reductions in actual cost, or improved outcomes.

19   (*Id.*)  During the conference call, among other things, Alphatec management was questioned about

20   its rumored divestiture of a Japanese distributor, to which Mr. Wulff replied:

21           RAJ DENHOY: Okay. Just one last one. I guess there was some talk about a Japanese
        distributor you were potentially going to be divesting.  Is that still something that's in

22           the works?

23           PETER WULFF: Yes.  That's actually been accomplished.  That should substantially
        help our margins going forward.

24

25           RAJ DENHOY: What's the revenue offset in Asia-Pacific?

26           PETER WULFF: The revenue offset is about $3 million.  But realize that was at
        virtually no margin.  So, we kept the spine revenue.  It's all the non-spine that we got
        rid of and so actually net-net it's going to have a positive impact.

27

28           RAJ DENHOY: On the margin side.  But from a revenue basis, that's $3 million a
        quarter we should assume is coming out of Asia-Pacific?

10cv1673

PETER WULFF: The total reported last year is about $10 million in top line revenue. The bottom line was negligible and net profit or even very low gross margin. We baked this into our financial guidance for revenues this year, Raj, and we expect the offset to be in the improvements both in the United States and in Europe.

(*Id.*, Exh. 16, at 827.)

On August 5, 2010, Alphatec announced its second quarter results, including consolidated revenues of $45.4 million, representing combined-company year-over-year revenue growth of 10%. (*Id.*, Exh. 17, at 837.) At the same time, Alphatec revised its 2010 revenue guidance downward to $188 to $193 million and adjusted EBITDA to $21 to $24 million. (*Id.*, Exh. 17, at 840.) Alphatec cited the slowing of the U.S. and European spine market growth as one of the reasons for the revised guidance. (*Id.*) During the conference call the same day, Mr. Kuyper indicated that the revised guidance was also in part due to the setbacks suffered in integrating Scient'x. Specifically:

We have made tremendous progress in integrating Scient'x into Alphatec Spine in the second quarter. As I previously stated, we completed the US consolidation, realizing significant cost savings, and have commenced initial integration of the international operations. *It did take longer than anticipated to get Alphatec products loaded into Scient'x's international distribution system, and for us to get Scient'x's products loaded into Alphatec's US inventory.*

*There was a great deal of complexity involved in loading thousands of new SKU's into each respective format. And this process took longer than we previously anticipated.* It has since been resolved and we are invoicing and shipping products across the entire organization.

*Separately, we saw an unanticipated slowdown in orders from our international distribution partners of Scient'x products from historical levels during the second quarter.* We believe this to be temporary as some distribution agents held back purchases until we clearly explained our consolidated product strategy going forward. Over 120 distribution partners from around the world attended our international sales meeting in Vienna, and we were pleased with the discussions and subsequent order commitments for products for the rest of 2010.

(*Id.*, Exh. 18, at 857.) When asked whether the Alphatec management was simply "blindsided" by what happened in the market, Mr. Wulff replied:

I think we underestimated the complexity in getting the Scient'x product loaded ino Alphatec and vice versa. Alphatec product loaded into Scient'x. *It took us about six weeks longer than we had originally estimated, and it really—we are talking about thousands of SKUs, completely different platforms and numbers that have nothing in common.*

*So we had to work through that. So we think we lost about six weeks of productivity that way. So that certainly had an impact.*

(*Id.*, Exh. 18, at 858.) The company's August 5, 2010 announcement led to a sharp sell off of Alphatec

- 6 -

10cv1673

1   shares, which plunged 46% to close at $2.39 on August 6, 2010, on a volume of 13.2 million shares.

2   This represented a loss of over $177 million in one trading day.  (CAC ¶ 81.)  Two months later, on

3   October 11, 2010, Mr. Wulff resigned as Alphatec's CFO and Treasurer, transitioning instead to the

4   newly-created position of Senior Vice President, Strategic Initiatives.  (CAC ¶ 82.)

5        Plaintiffs allege that following the August 5, 2010 announcement, one analyst who follows the

6   company noted that Alphatec's revenue reduction was "all the more troubling as Alphatec gave

7   guidance on May 10, half way through the second quarter."  (CAC ¶ 80.)  According to the analyst,

8   the revenue reduction was due in part to "the discontinuation of a Japanese distributor that wasn't

9   previously communicated," which amounted to approximately $3 million, and also due to "channel

10  stuffing" by Scient'x prior to its acquisition by Alphatec.[4]  (Id.)  With respect to the latter, the analyst

11  stated that "[c]onfounding the result in Europe is indication that there may have been some stocking

12  in Europe prior to Alphatec acquiring Scient'x, which could have overstated the run rate there and also

13  created an air pocket of demand in Europe in Q2."  (Id.)

14       On February 24, 2011, Alphatec announced its final financial results for 2010.  The company

15  reported consolidated revenues of $171.6 million and pro forma revenues of $182.9 million,

16  representing an increase of 42.3% and 7.1%, respectively, as compared to 2009.  (Decl. of Jessica L.

17  Snorgrass ISO Healthpoint Defs.' MTD ("Snorgrass Decl."), Exh. A, at 11 [Doc. No. 41-3].)  The

18  company reported an adjusted EBITDA of $18.9 million.  (Id.)

19  **II.   Procedural background**

20       Plaintiffs commenced this action on August 10, 2010, and filed a Corrected Amended Class

21  Action Complaint ("CAC") on February 22, 2011.  The CAC alleges the following causes of action:

22  (1) violation of § 11 of the Securities Act against Alphatec, the individual Defendants, and the

23  Underwriter Defendants; (2) violation of § 12(a)(2) of the Securities Act against Alphatec,

24  Healthpoint, and the Underwriter Defendants; (3) violation of § 15 of the Securities Act against

25  Healthpoint and the individual Defendants ("control person" liability); (4) violation of § 10(b) of the

26  Exchange Act and Rule 10b-5 against Alphatec, Kuyper, and Wulff; and (5) violation of § 20(a) of the

27

28       [4] "Channel stuffing" is "the oversupply of distributors in one quarter to artificially inflate sales,
which will then drop in the next quarter as the distributors no longer make orders while they deplete
their excess supply."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).

1   Exchange Act against Healthpoint and the individual Defendants ("control person" liability).

2         Plaintiffs bring this action on behalf of a class consisting of: (1) "all those who purchased or

3   otherwise acquired Alphatec common stock issued pursuant or traceable to the February 12, 2010

4   Registration Statement and April 16, 2010 Prospectus incorporated therein and were damaged

5   thereby," and (2) "all those who purchased or otherwise acquired the common stock of Alphatec

6   between April 16, 2010 and August 5, 2010, inclusive" (the "Class Period"). (CAC ¶ 1.)

7         On January 19, 2011, the Court appointed Fresno County Employees' Retirement Association

8   as the Lead Plaintiff. On April 18, 2011, the Alphatec Defendants, the Healthpoint Defendants, and

9   the Underwriter Defendants each filed a motion to dismiss the CAC. Plaintiffs filed a consolidated

10   opposition on June 6, 2011. Defendants filed their replies on June 27, 2011. On August 9, 2011,

11   Plaintiffs filed a notice of recent authority, to which the Alphatec Defendants responded on August

12   23, 2011, and the Underwriter Defendants responded on August 30, 2011. The Court decides these

13   motions without oral argument pursuant to Civil Local Rule 7.1(d)(1).

14                                                **LEGAL STANDARD**

15         Defendants move to dismiss the CAC pursuant to Federal Rules of Civil Procedure 9(b) and

16   12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the pleadings.

17   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, a complaint

18   must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

19   its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

20   U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks

21   for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts

22   that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility

23   and plausibility of "entitlement to relief."'" *Id.* (internal citation omitted). "Dismissal can be based

24   on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

25   legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

26         In ruling on a motion to dismiss, the Court must "accept all factual allegations in the complaint

27   as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v.*

28   *ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). The Court, however, need not accept "legal conclusions"

as true. *Iqbal*, 129 S. Ct. at 1949. Thus, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. It is also improper for the Court to assume that plaintiff "can prove facts that it has not alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). On the other hand, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

A complaint alleging fraud must also comply with Rule 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). In order to allege fraud with the requisite particularity, "'a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.'" *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)). "This falsity requirement can be satisfied 'by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.'" *Id.* (quoting *GlenFed*, 42 F.3d at 1549). Although claims under § 11 and § 12 of the Securities Act do not require allegations of fraud, Rule 9(b) applies to those claims nonetheless if the entire complaint "sounds in fraud." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

Finally, claims brought under the Exchange Act are also subject to the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737 (1995) (codified in part at 15 U.S.C. §§ 77z-1, 78u), regarding scienter. The PSLRA "requires that a complaint alleging misleading statements or omissions 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts on which that belief is formed.'" *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011) (quoting 15 U.S.C. § 78u-4(b)(1)). "Thus, the misrepresentation claims pled [under the Exchange Act] must satisfy the 'particularity' requirement of Rule 9(b) of the Federal Rules of Civil Procedure, the 'plausibility' requirement of *Iqbal*, and the scienter requirement of the PSLRA." *Id.* at 690-91.

## DISCUSSION[5]

### I.    Violations of Sections 11 and 12(a)(2) of the Securities Act

Claims one and two allege that the April 16, 2010 Prospectus and the Registration Statement incorporating the Prospectus were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein in violation of § 11 and § 12(a)(2) of the Securities Act. Plaintiffs base these claims on strict liability or negligence, and expressly attempt to disclaim any allegations of fraud, scienter, and intent to defraud. The § 11 claim is alleged against Defendant Alphatec, the individual Defendants, and the Underwriter Defendants. The § 12(a)(2) claim is alleged against Defendants Alphatec, Healthpoint, and the Underwriter Defendants.

Defendants first move to dismiss these claims because they "sound in fraud," but are not pled with the particularity required by Rule 9(b). Second, Defendants assert the challenged statements are not actionable under the PSLRA's "safe harbor" provision for forward-looking statements. Third, Defendants contend the CAC should be dismissed under Rules 8 and 12(b)(6) because there are no facts alleged to show that the statements were false or misleading. Fourth, Defendants assert dismissal is proper because the CAC establishes lack of causation. Finally, Defendants Alphatec and Healthpoint contend that each of them is not a "seller" of the securities for purposes of § 12(a)(2).

#### A.    Rule 9(b) applicability

To recover under § 11, the plaintiff must demonstrate: (1) that the registration statement

---

[5] Having considered the parties' requests for judicial notice, the Court will take judicial notice of the SEC filings, press releases, and transcripts of conference calls, copies of which are attached to each party's moving papers because those documents were either referenced in the CAC or are not subject to reasonable dispute. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in ruling on a motion to dismiss, the court "must consider the complaint in its entirety," including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings subject to judicial notice); *In re Stac*, 89 F.3d at 1405 n.4 (the court can properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" (citation and internal quotation marks omitted)). Where inappropriate, the Court will not consider these documents for the truth of the matters asserted therein. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010).

On the other hand, the Court declines to take judicial notice of two charts drafted by counsel for the Alphatec Defendants, containing full text of the challenged statements and of Alphatec's risk disclosures excerpted from relevant SEC filings. (*See* Smith Decl., Exhs. 20, 21.) These charts are cumulative of the information that the Court may independently consider.

1   contained an omission or misrepresentation; and (2) that the omission or misrepresentation was

2   material. *In re Stac*, 89 F.3d at 1403-04; *see also* 15 U.S.C. § 77k(a). To prevail under § 12(a)(2), a

3   plaintiff must demonstrate: "(1) an offer or sale of a security, (2) by the use of a means or

4   instrumentality of interstate commerce, (3) by means of a prospectus or oral communication, (4) that

5   includes an untrue statement of material fact or omits to state a material fact that is necessary to make

6   the statements not misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008); *see also*

7   15 U.S.C. § 77*l*(a)(2). No scienter is required for liability under § 11 or § 12(a)(2); defendants may

8   be liable for innocent or negligent material misstatements or omissions. *See Miller*, 519 F.3d at 886

9   (Section 12(a)(2)); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (Section 11).

10          Notwithstanding the foregoing, plaintiffs may be required to allege their claims with increased

11   particularity under Rule 9(b) if their complaint "sounds in fraud." *Rubke*, 551 F.3d at 1161. "To

12   ascertain whether a complaint 'sounds in fraud,' [the Court] must normally determine, after a close

13   examination of the language and structure of the complaint, whether the complaint 'alleges a unified

14   course of fraudulent conduct' and 'relies entirely on that course of conduct as the basis of a claim.'"

15   *Id.* (citation omitted) (assuming the complaint sounded in fraud where the complaint "employ[ed] the

16   exact same factual allegations to allege violations of section 11 as it use[d] to allege fraudulent conduct

17   under section 10(b) of the Exchange Act"); *see also In re Daou*, 411 F.3d at 1028 (concluding that the

18   complaint sounded in fraud where it alleged myriad misrepresentations made by defendants and made

19   a "wholesale adoption" of those allegations for purposes of the Securities Act claims).

20          In the present case, with respect to the Alphatec Defendants and the Healthpoint Defendants,

21   the CAC "sounds in fraud." The core allegation of the CAC is that these Defendants "engaged in a

22   scheme to inflate the price of Alphatec shares" in order to enable the company's principal

23   shareholders, the Healthpoint Defendants, to dispose of their 95% interest in Scient'x; to enable the

24   Alphatec Defendants and the Healthpoint Defendants "to sell millions of Alphatec stock in the

25   Offering at artificially inflated prices;" and "for the personal benefit of Defendants Berkowitz, Foster,

26   Molson, O'Neil, and Hochschuler." (*See* CAC ¶ 2.) These allegations are repeated in one form or

27

28

1   another through the CAC.[6] In light of these allegations, it is hard to read the CAC as alleging *anything*

2   *but* that the Alphatec Defendants and the Healthpoint Defendants engaged in a fraudulent scheme to

3   first divest the Healthpoint's interest in Scient'x, and then to make a substantial amount of money in

4   the Offering on the basis of false and misleading statements.  Accordingly, at least with respect to

5   these Defendants, the CAC "'alleges a unified course of fraudulent conduct' and 'relies entirely on that

6   course of conduct as the basis of [the Securities Act claims],'" and therefore "sounds in fraud." *See*

7   *Rubke*, 551 F.3d at 1161 (citations omitted); *see also In re Daou*, 411 F.3d at 1028.

8          Plaintiffs' attempts to disclaim any allegations of fraud, scienter, or intent to defraud with

9   respect to the Securities Act claims are unpersuasive.[7]  Courts have found such "nominal efforts" to

10  disclaim fraud to be unavailing, especially where the gravamen of the complaint is the allegation of

11  a fraudulent scheme on behalf of the defendants. *See, e.g., In re Stac*, 89 F.3d at 1405 n.2 ("These

12  nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort

13  is made to show any other basis for the claims levied at the Prospectus."); *In re Mikohn Gaming Corp.*

14  *Sec. Litig.*, No. 2:05-CV-01410-PMP-RJJ, 2006 WL 2547095, at *10 (D. Nev. Sept. 1, 2006) (the

15  complaint sounded in fraud, despite the attempts to bifurcate the Securities Act and Exchange Act

16

17          [6] *See, e.g.*, CAC ¶ 45 ("Defendants Berkowitz and Foster used their controlling interests in
    Alphatec to compel the Company's board to consider purchasing Scient'x"); ¶ 46 ("Defendant
18  Berkowitz began to engineer a sale of Scient'x to Alphatec in the hopes of allowing Healthpoint to
    escape any further losses on its investment in Scient'x."); ¶ 65(c)(ii) ("Defendants had engaged in
19  channel stuffing prior to the acquisition, which made Scient'x sales appear greater than they actually
    were prior to the acquisition, and limited its ability to generate revenue following the acquisition.");
20  ¶ 87 ("Defendants' knowing disregard of pricing pressures throughout the Class Period proximately
    caused Lead Plaintiff's and Class members' losses."); ¶ 90 ("Defendants knew, even before the Class
21  Period began, that U.S. sales volume was not increasing at anywhere near the rate required to attain
    Defendants' wildly positive 2010 forecasts of revenue . . . ."); ¶ 100 ("Defendants each had strong
22  financial incentives to inflate the price of Alphatec stock in anticipation of the Offering in April 2010.
    They accomplished this by means of the materially false and misleading statements provided to and
23  omissions kept from investors, as outlined above."); ¶ 107 ("Healthpoint and Defendants Berkowitz,
    Foster, O'Neil, Molson, and Hochschueler, because of their interests in Healthpoint and Alphatec,
24  were strongly motivated to inflate the value of Alphatec's stock, and thus the consideration they were
    to receive in the Offering in April 2010.  Such a motive indicates Defendants' fraudulent intent.").
25
          [7] *See, e.g.*, CAC ¶ 11 ("Pursuant to Fed. R. Civ. P. 8(d), Lead Plaintiff specifically disclaims
26  any allegations of fraud in connection with these Securities Act claims, which sound in strict liability
    and negligence and are not based on any allegations of knowing or reckless misconduct on the part of
27  any Defendant."); ¶ 119 (incorporating, with respect to claim one, all of the CAC's prior allegations
    only to the extent "that such allegations do not allege fraud, scienter or the intent of the Defendants
28  to defraud"); ¶ 120 (disclaiming any allegations of fraud with respect to claim one), ¶ 137 (same with
    respect to claim two), ¶ 146 (same with respect to claim three).

- 12 -

1   claims, where "the two sets of claims rel[ied] upon the same unified course of fraudulent conduct").

2   The fact that Rule 9(b) applies does not mean that Plaintiffs' Securities Act claims necessarily

3   fail. It only means that Plaintiffs must allege the specific elements of those claims with Rule 9(b)

4   particularity. *See In re Daou*, 411 F.3d at 1028. More importantly, however, fraud does not suddenly

5   become an element of these claims. Rather, "'[w]here averments of fraud are made in a claim in

6   which fraud is not an element, . . . [t]he proper route is to *disregard* averments of fraud not meeting

7   Rule 9(b)'s standard and then ask whether a claim has been stated.'" *Id.* at 1027 (citation omitted).

8   Finally, the only allegations against the Underwriter Defendants are that they drafted and

9   disseminated the April 16, 2010 Prospectus pursuant to which Alphatec's shares were sold. (*See* CAC

10  ¶¶ 31-35.) Because the CAC makes no allegations of fraud or intent to deceive on behalf of the

11  Underwriter Defendants, the allegations against these Defendants are sufficiently bifurcated for Rule

12  9(b) purposes. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266 (N.D. Cal.

13  2000) (concluding that a Securities Act § 14(a) claim sounded in fraud only as to some defendants,

14  as to whom particularized fraud allegations were made). Accordingly, Rule 9(b) particularity

15  requirements do not apply to the allegations against the Underwriter Defendants. *See In re Surebeam*

16  *Corp. Sec. Litig.*, No. 03 CV1721 JM (POR), 2005 WL 5036360, at *7 (S.D. Cal. Jan. 3, 2010); *In re*

17  *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1063 (C.D. Cal. 2008).

18  **B.    "Safe harbor" applicability**

19  Defendants contend that certain statements challenged by Plaintiffs are not actionable because

20  they are protected by the PSLRA's safe harbor for "forward-looking" statements. The safe harbor

21  provision of the Securities Act removes liability with respect to any "forward-looking" statement,

22  whether written or oral, as long as one of the following is satisfied: (1) the statement is "identified as

23  a forward-looking statement" *and* "is accompanied by meaningful cautionary statements identifying

24  important factors that could cause actual results to differ materially from those in the forward-looking

25  statement;" (2) the statement is immaterial; *or* (3) the plaintiff fails to prove that the statement was

26  made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 77z-2(c)(1).

27  The PSLRA defines a "forward-looking statement" broadly to include, among other things, a

28  projection of revenues, income, earnings, or other financial items; a statement of the plans and

1   objectives of management for future operations; a statement of future economic performance; and any

2   statement of the assumptions underlying or relating to any of the preceding. *See* 15 U.S.C. § 77z-

3   2(i)(1). "A present-tense statement can qualify as a forward-looking statement as long as the truth or

4   falsity of the statement cannot be discerned until some point in time after the statement is made." *In*

5   *re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067 (N.D. Cal. 2001). At the same

6   time, statements concerning historical or current facts are not forward-looking, even if couched in

7   terms of the future. *See, e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal.

8   2004) (characterizations of business as "solid" and "on track" were not forward-looking); *In re Secure*

9   *Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (defendants' statement that

10  the company "was on track to meet analysts' earnings expectations" was not forward-looking where

11  it could reasonably be viewed as "misrepresentation[] about current business conditions"); *see also*

12  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920,

13  937 (9th Cir. 2003) (statements about the present effect of a past violation are not forward looking).

14          In the present case, the first challenged statement is: "We have *already begun* to realize

15  synergies from the Scient'x acquisition" (emphasis added). This sentence is based on representation

16  of historical or current facts, and therefore is not "forward-looking." *See, e.g.*, *In re Copper Mountain*,

17  311 F. Supp. 2d at 880; *In re Secure Computing Corp.*, 120 F. Supp. 2d at 818.

18          The second statement is: "In addition, we anticipate that our revenues throughout the balance

19  of 2010 *will continue to grow*, driven by the inclusion of Scient'x revenues, cross-selling opportunities

20  between Alphatec and Scient'x, the increased global scale of our distribution and marketing efforts,

21  and the approval and launch of up to 15 innovative products into the U.S. and/or E.U. markets"

22  (emphasis added). While ostensibly couched in terms of the future, this statement also concerns

23  historical and current facts. Notably, for the revenues to "continue to grow," it is necessary that they

24  have *already been growing*. *See In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-cv-0965, 2009 WL

25  6325540, at *32 (S.D. Tex. July 9, 2009) ("The specific statement that the onshore business continues

26  to grow rapidly includes a comment on historical fact—that onshore business had grown rapidly in the

27  past—and a statement of historical fact cannot be protected by the safe harbor."). Accordingly,

28  because this statement can reasonably be viewed as a misrepresentation of the company's current

1   business conditions, it is not forward-looking. *See In re Secure Computing*, 120 F. Supp. 2d at 818.

2          Finally, to the extent Plaintiffs also challenge Defendants' alleged *omission of present facts*

3   with respect to the challenged statements, the PSLRA's safe harbor does not apply. *See, e.g., In re*

4   *Portal Software, Inc. Sec, Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *13 (N.D. Cal. Aug. 10,

5   2005) (no safe harbor protection for "omissions of past and current facts regarding declining sales and

6   product demand as well as difficulties marketing [defendant's] product"); *In re CV Therapeutics, Inc.*,

7   No. 03-03709 SI, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) ("The fact that defendants used

8   those inadequately disclosed historical facts to support unsound projections does not shield their

9   alleged misrepresentations as forward-looking statements.").

10          C.     Misrepresentation or omission

11          Defendants next contend that claims one and two should be dismissed because they fail to

12   allege facts to show that there was any misrepresentation or omission. The Court agrees.

13                 1.     *Plaintiffs failed to allege sufficient facts to show that Defendants omitted facts*
                         *from the Prospectus that were required to be disclosed.*
14

15          Plaintiffs first allege that Defendants omitted facts from the April 16, 2010 Prospectus, and

    accordingly the Registration Statement, that were required to be disclosed pursuant to Item 303 of
16
    Regulation S-K of the Securities Act. "Allegations which state a claim under Item 303(a) of
17
    Regulation S-K also sufficiently state a claim under Sections 11 and 12(a)(2)." *Steckman*, 143 F.3d
18
    at 1296. Item 303(a)(3)(ii) requires that a registrant "[d]escribe any known trends or uncertainties that
19
    have had or that the registrant reasonably expects will have a material favorable or unfavorable impact
20
    on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  Here,
21
    Plaintiffs allege Defendants should have disclosed the following known trends and uncertainties:
22
                 -      Pricing pressures arising from consolidation in the spine industry;
23               -      Delays in integration of Scient'x that had affected productivity and sales; and
                 -      Reduced sales of Alphatec products to Scient'x distributors and vice versa.
24
           With respect to pricing pressures, Plaintiffs have failed to demonstrate that Defendants have
25
    omitted anything. Plaintiffs contend Defendants should have disclosed the "trend" of pricing pressures
26
    in the U.S. and Europe, which was steadily increasing and allegedly limiting Alphatec's ability to
27
    achieve significant revenue growth in 2010. (CAC ¶ 65(c)(i).)  Defendants, however, did disclose
28
    these pricing pressures. Specifically, Alphatec's Form 10-K for the fiscal year ending December 31,

2009, which was incorporated by reference into and made part of the April 16, 2010 Prospectus, warned investors that consolidation in the healthcare industry "has resulted and will likely continue to result in greater pricing pressures," and that Alphatec expected various factors "will continue to change the worldwide healthcare industry, resulting in further business consolidations and alliances among our customers, which may reduce competition, exert further downward pressure on the prices of our products and may adversely impact our business, financial condition or results of operations." (*See* Smith Decl., Exh. 11, at 591 (Form 10-K for the fiscal year ending December 31, 2009); *id.*, Exh. 13, at 758 (incorporating the Form 10-K into the April 16, 2010 Prospectus).)

With regard to the other two omissions, Plaintiffs have failed to allege sufficient facts to show that they were either known to Defendants as of April 16, 2010, or could reasonably be expected to have a material impact on Alphatec's net sales, revenues, or income. With respect to delays, Plaintiffs allege that Defendants "failed to disclose that the integration of the two companies was experiencing delays and not proceeding as planned," and that "by April 16, it was readily apparent that there were delays in integrating Alphatec's and Scient'x's computer systems." (CAC ¶ 65(a), (c)(v).) However, apart from conclusory statements that these delays existed, Plaintiffs fail to allege any facts to show that such delays were *known* at that time or that they could *reasonably be expected* to have a *material* impact.[8] *See Steckman*, 143 F.3d at 1297-98 (holding that Item 303(a)(3)(ii) "mandates not only knowledge of an adverse trend . . . and material impact . . . , but also that the future material impacts are *reasonably likely to occur* from the present-day perspective").

The same is true with regard to the reduced sales. Plaintiffs allege that Defendants failed to disclose that "in the second quarter of 2010, international distributors were indicating an unwillingness to accept some of the Company's products," and that "Alphatec had previously attempted to sell Scient'x's products through licensing agreements, including beginning in January 2007, but ultimately

---

[8] Plaintiffs' citation to Defendants' subsequent disclosure, on August 5, 2010, that there was a six-week delay in loading Scient'x's products into Alphatec and vice versa, (*see* CAC ¶¶ 77-78), is insufficient by itself to show that those delays were either known or could reasonably be expected to have a material impact as of April 16, 2010. *See Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) ("'Fraud by hindsight is not actionable.'" (citation omitted)); *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 322 (W.D.N.Y. 2010) (although "defendants acknowledged in August 2007 that there had been an adverse effect at some point in time, that does not lead to the conclusion that such effect existed in January 2007 or that defendants were aware of any such effect in January 2007").

1   terminated the agreements in April 2008 and returned products to Scient'x." (CAC ¶ 65(c)(iv), (c)(v).)

2   Plaintiffs, however, fail to allege any facts to show that the distributors' unwillingness to accept the

3   company's products *in the second quarter*, which began on April 1, 2010, was known to Defendants

4   on April 16, 2010, or could reasonably be expected to have a material impact at that time. *See Kapps*

5   *v. Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) (it was not unreasonable to consider a five-

6   month decline in natural gas prices "as not yet constituting a trend," where the prices rapidly dropped

7   over the first two of those five months and then only gradually dropped, and where they have not yet

8   significantly impacted the company's gross revenue); *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d

9   1182, 1191 (11th Cir. 2002) ("It may be that a particular pattern is, for example, of such short duration

10  that it will not support any conclusions about the registrant's business environment."); *Blackmoss Invs.*

11  *Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D. N.Y. Jan. 14,

12  2010) ("As a matter of law, a two[]month period of time does not establish a 'trend' for purposes of

13  the disclosures required by Item 303."); *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp.

14  2d 8, 13 (S.D. N.Y. 2001) (single quarter decline of 9% in operating income was not a "known trend"

15  needed to be disclosed).   Likewise, Plaintiffs fail to allege any facts to show why Alphatec's prior

16  attempt to sell Scient'x's products could reasonably be expected to have a material impact.   Without

17  such allegations, any supposition as to why Alphatec previously terminated those sale agreements is

18  pure speculation, which is insufficient to state a claim for relief. *See Iqbal*, 129 S. Ct. at 1949.

19      Accordingly, Plaintiffs have failed to allege sufficient facts to show that Defendants omitted

20  facts from the April 16, 2010 Prospectus that they were required to disclose pursuant to Item 303.

21          2.      *Plaintiffs failed to allege specific facts to show that Defendants omitted facts*
                    *that were necessary to make the challenged statements not misleading.*
22

23      In the alternative, Plaintiffs allege Defendants were obligated to disclose certain facts that were

24  "necessary to make the statements [in the Prospectus] not misleading." *See* 15 U.S.C. § 77k(a).

25  Specifically, Plaintiffs allege that Defendants' statement that "We have already begun to realize

26  synergies from the Scient'x acquisition" was misleading because Defendants failed to disclose that the

27  integration of the two companies was experiencing delays. (CAC ¶¶ 64-65.) Plaintiffs allege that

28  Defendants' statement that "[W]e anticipate that our revenues throughout the balance of 2010 will

    continue to grow, driven by the inclusion of Scient'x revenues, cross-selling opportunities between

- 17 -

1    Alphatec and Scient'x, the increased global scale of our distribution and marketing efforts" was

2    misleading because Defendants failed to disclose the following: (1) two-thirds of Scient'x's U.S.

3    distributors overlapped with Alphatec's distributors, and would have to be cut; (2) pricing pressures

4    in the U.S. and Europe were steadily increasing, limiting Alphatec's ability to achieve significant

5    revenue growth; (3) Defendants had engaged in channel stuffing prior to the acquisition, which made

6    Scient'x's sales appear greater than they actually were, thereby limiting its ability to generate revenue;

7    (4) Alphatec had previously attempted to sell Scient'x's products, but ultimately terminated the sale

8    agreements; (5) there were delays in integrating Alphatec's and Scient'x's computer systems; and (6)

9    international distributors were unwilling to accept some of the company's products. (*Id.*)

10       Plaintiffs fail to show how the omission of the fact that there were integration delays made

11   Alphatec's statement that it had "already begun to realize synergies" from the Scient'x acquisition

12   misleading. As an initial matter, this statement was literally true. In the Prospectus, immediately

13   following the statement, Alphatec listed the following synergies that *have already been realized* from

14   its acquisition of Scient'x: (1) "Our OsseoFix Spinal Fracture Reduction System is now being sold in

15   six countries," and (2) "As a result of the Scient'x acquisition we have also added 19 distribution

16   agents in the U.S." (*See* Smith Decl., Exh. 13, at 703.) Plaintiffs do not contend that either of these

17   synergies was not realized at the time the challenged statement was made. Moreover, as the Court

18   already concluded, apart from conclusory statements, Plaintiffs fail to allege sufficient facts to show

19   that Defendants were aware of any integration delays as of April 16, 2010. Finally, even assuming

20   Alphatec was experiencing integration delays at the time, that fact is not inconsistent with Alphatec

21   realizing synergies as a result of the Scient'x acquisition. *See Ronconi v. Larkin*, 253 F.3d 423, 434

22   (9th Cir. 2001) ("A company could experience 'serious operational problems,' 'substantial

23   difficulties,' and 'difficult problems' and still have increasing revenues.").

24       The Court next examines Plaintiffs' contention that Defendants' alleged omission of certain

25   facts made Alphatec's statement that it anticipated that its revenues throughout the balance of 2010

26   "will continue to grow" misleading. As an initial matter, the Court rejects Defendants' argument that

27   the motion to dismiss should be granted because this statement was ultimately proven true. It may be,

28   as Defendants argue, that during each quarter of 2010 and at the end of the 2010 fiscal year, the

- 18 -

1  company did report year-over-year revenue growth.[9]  However, "literal truth is not the standard for

2  determining whether statements in a prospectus are misleading." *Miller*, 519 F.3d at 886.  "'Some

3  statements, although literally accurate, can become, through their context and manner of presentation,

4  devices which mislead investors.  For that reason, the disclosure required by the securities laws is

5  measured not by literal truth, but by the ability of the material to accurately inform rather than mislead

6  prospective buyers.'" *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (citation

7  omitted).  Accordingly, a plaintiff may prevail if it demonstrates "that a particular statement, when

8  read in light of all the information then available to the market, or a failure to disclose particular

9  information, conveyed a false or misleading impression." *See id.*

10  Plaintiffs, however, have failed to allege sufficient facts to show that any information that

11  Defendants omitted made Alphatec's statement that it anticipated that its revenues throughout the

12  balance of 2010 "will continue to grow" misleading.  First, as already noted, Defendants did disclose

13  the increasing pricing pressures by discussing them in Alphatec's Form 10-K for the fiscal year ending

14  December 31, 2009, which was incorporated by reference into and made part of the April 16, 2010

15  Prospectus. (*See* Smith Decl., Exh. 11, at 591; *id.*, Exh. 13, at 758.)  Second, with regard to the

16  integration delays and the international distributors unwillingness to purchase certain Scient'x products

17  in the second quarter, even if those delays and that unwillingness were evident by April 16, 2010,

18  Plaintiffs have failed to show how they were inconsistent with the company's statement that it

19  anticipated that its revenue will continue to grow.  *See Ronconi*, 253 F.3d at 434 ("A company could

20  experience 'serious operational problems,' 'substantial difficulties,' and 'difficult problems' and still

21  have increasing revenues.").  Third,  Plaintiffs allege that Alphatec in the past attempted to sell

22  Scient'x's products, but ultimately terminated those sale agreements.  Plaintiffs, however, do not allege

23  what specific products were sold at that time or under what circumstances the sale agreements were

24  terminated.  Such conclusory statements are insufficient to show that Alphatec's statement that it

25  expected to have "cross-selling opportunities" from the sale of Scient'x's current products was

26

27  [9] *See, e.g.*, Decl. of Nolan J. Mitchell ISO the Underwriter Defs.' MTD ("Mitchell Decl."), Exh. 2, at 6 (25.6% year-over-year consolidated revenue growth for the first quarter 2010); *id.*, Exh. 4, at 6 (55% for the second quarter); *id.*, Exh. 6, at 6 (49% for the third quarter); *id.*, Exh. 1, at 7

28  (38.4% growth for the fourth quarter); *id.*, Exh. 1, at 8 (full year 2010 consolidated revenue growth of 42.3% and pro forma revenue growth of 7.1%, as compared to 2009).

1 misleading, and are therefore insufficient to state a claim for relief. *See Iqbal*, 129 S. Ct. at 1949.

2     Fourth, with respect to allegations of channel stuffing, Plaintiffs base these allegations solely

3 on the say-so of one analyst, who remarked, after Alphatec's August 5, 2010 revised financial

4 guidance, that: "Confounding the result in Europe is *indication* that there *may have been* some

5 stocking in Europe prior to Alphatec acquiring Scient'x, which *could have* overstated the run rate there

6 and also created an air pocket of demand in Europe in Q2." (CAC ¶ 80 (emphases added).) Channel

7 stuffing claims often amount to "speculation made in hindsight." *See Steckman*, 143 F.3d at 1298.

8 While such claims may have probative value when the channel stuffing is used to artificially inflate

9 income, there may also be other legitimate reasons for attempting to achieve sales earlier. *See In re*

10 *ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. D 1055, 1061-62 (C.D. Cal. 2004) (rejecting plaintiffs'

11 claims of improper channel stuffing). Therefore, to survive a motion to dismiss, more than conclusory

12 allegations are necessary. In this case, even Plaintiffs' analyst only stated that there was an

13 "indication" that there "may have been" some channel stuffing taking place before the Scient'x

14 acquisition. Such conclusory statements are insufficient to state a claim for relief. *See Iqbal*, 129 S.

15 Ct. at 1949; *see also Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1114 (N.D. Cal. 2003)

16 (plaintiffs' channel stuffing allegations insufficient to support their claims that the challenged

17 statements were false when made or that defendants acted with the requisite scienter); *In re Splash*

18 *Tech.*, 160 F. Supp. 2d at 1076 (rejecting plaintiffs' channel stuffing allegations as conclusory).

19     Finally, Plaintiffs have failed to show how Defendants' failure to disclose that two-thirds of

20 Scient'x's U.S. distributors overlapped with Alphatec's distributors made the challenged statement

21 misleading, especially in light of the company's announcement that it added 19 additional distributors

22 in the U.S. because of the Scient'x acquisition. (*See* Smith Decl., Exh. 13, at 703.)

23     In light of Plaintiffs' failure to allege sufficient facts to show that there was any

24 misrepresentation or omission for purposes of § 11 or § 12(a)(2) liability, the Court need not consider

25 at this time whether any of the allegedly omitted or misrepresented facts were material.[10]

26 _____

27     [10] The Court also does not consider, in the context of claims one and two, whether Defendants'
2010 revenue guidance was false or misleading. As Defendants correctly point out, the 2010 revenue

28 guidance was not stated in the April 16, 2010 Prospectus or in the Registration statement incorporating

### D. Negative causation

Defendants argue that claims one and two should also be dismissed because the CAC establishes negative causation. Absence of loss causation, or "negative causation," is an affirmative defense to a § 11 or § 12(a)(2) claim where a portion of the stock price decline is not attributable to the alleged misrepresentation or omission. *See* 15 U.S.C. §§ 77k(e), 77*l*(b); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421-22 (9th Cir. 1994) (the defendant has the burden of establishing the absence of loss causation). Such a determination, however, is usually reserved for the summary judgment stage. *See In re Countrywide Fin.*, 588 F. Supp. 2d at 1171 ("'Because an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.'" (citation omitted)); *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610(JFK), 96 Civ. 3611(JFK), 2005 WL 2088406, at *2 (S.D. N.Y. Aug. 30, 2005) ("To conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies."). Accordingly, at this time, the Court declines to determine whether negative causation is evident on the face of the complaint, especially in light of the Court's dismissal of claims one and two on other grounds.

### E. Not a "seller" of the securities

Healthpoint and Alphatec next move to dismiss claim two against them because each of them is not a "seller" of the securities for purposes of § 12(a)(2).[11] Section 12(a)(2) imposes liability upon any person who "offers or sells a security." 15 U.S.C. § 77*l*(a)(2). This encompasses both direct sellers who pass title of the subject securities and indirect sellers who "successfully solicit[] the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the

---

the Prospectus. Although Plaintiffs contend that the revenue guidance was stated in Alphatec's Form 8-K, and therefore incorporated by reference into the Prospectus, the Prospectus expressly excluded from incorporation any part of Form 8-K furnished under Item 2.02, which includes Alphatec's revenue guidance in this case. (*See* Smith Decl., Exh. 13, at 758; Glancy Decl., Exh. 1.) Because the revenue guidance was neither stated in the Prospectus nor incorporated into it by reference, it is not actionable under either § 11 or § 12(a)(2) of the Securities Act. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2); *see also In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 267 (E.D. N.Y. 2002).

[11] While Plaintiffs' claim two is also alleged against the Underwriter Defendants, the Underwriter Defendants do not contest that they are a "seller" for purposes of § 12(a)(2).

10cv1673

securities owner." *Pinter v. Dahl*, 486 U.S. 622, 644 n.21, 647 (1988). Notably, "a buyer cannot recover against his seller's seller." *Id.* at 644 n.21. Healthpoint and Alphatec urge that the § 12(a)(2) claim against them should be dismissed because: (1) the sale in this case was accomplished through firm underwriting, and therefore they were not direct sellers of the securities, and (2) Plaintiffs have failed to show that these Defendants actively solicited the purchase of the securities.

The Court declines to dismiss claim two on this basis as to Defendant Alphatec. The CAC adequately alleges that Alphatec "successfully solicit[ed]" the purchase of its securities by issuing and promoting the Prospectus, and that it did so "motivated at least in part by a desire to serve [its] own financial interests." *See Pinter*, 486 U.S. at 647. Moreover, as Plaintiffs point out, SEC Rule 159A provides that an issuer of securities is considered a statutory seller for purposes of § 12(a)(2) regardless of the form of underwriting. *See* 17 C.F.R. § 230.159A(a). According to the SEC, an issuer qualifies as a statutory seller because by "offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed," the issuer "can be viewed as soliciting purchases of the issuer's registered securities." *Securities Offering Reform*, Securities Act Release No. 52056, 2005 WL 1692642, at *78 (July 19, 2005) (citing *Pinter*, 486 U.S. 622); *see also In re Oppenheimer Rochester Funds Group Sec. Litig.*, — F. Supp. 2d —, 2012 WL 171035, at *28 (D. Colo. Jan. 20, 2012) (relying on SEC Rule 159A in holding that the issuers were statutory sellers for purposes of § 12(a)(2)); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D. N.Y. 2010) (same). *But see Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, — F. Supp. 2d —, 2012 WL 479106, at *10 (D. Mass. Feb. 14, 2012) (rejecting plaintiff's reliance on SEC Rule 159A and holding that the non-underwriter defendants were not liable as sellers under § 410(a) of the Massachusetts Uniform Securities Act); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP (MANx), 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011) (rejecting plaintiffs' reliance on SEC Rule 159A and dismissing the § 12(a)(2) claim against the issuer defendants).

On the other hand, the Court agrees that the CAC fails to allege sufficient facts to show that Defendant Healthpoint is a seller under § 12(a)(2). Healthpoint was not the immediate seller of Alphatec's securities. Nor are there sufficient allegations that Healthpoint either prepared the April

1   16, 2010 Prospectus or how it used the Prospectus to actually solicit the purchase of the securities.

2   *See Pinter*, 486 U.S. at 647.  Moreover, SEC Rule 159A(a) does not appear to apply to Healthpoint.

3   *See* 17 C.F.R. § 230.159A(a), note 2.  Accordingly, Plaintiffs have failed to allege sufficient facts to

4   show that Defendant Healthpoint was a "seller" for purposes of § 12(a)(2).

5           F.      Conclusion

6           For the foregoing reasons, Plaintiffs have failed to allege sufficient facts to show that

7   Defendants omitted facts from the April 16, 2010 Prospectus (or the Registration Statement) that they

8   were required to disclose or that Defendants omitted facts that were necessary to make the challenged

9   statements in the Prospectus not misleading.[12]  Plaintiffs have also failed to establish that Defendant

10  Healthpoint qualifies as a "seller" under § 12(a)(2).  Accordingly, Plaintiffs have failed to state a

11  violation of either § 11 or § 12(a)(2) of the Securities Act against each group of Defendants.  In light

12  of the foregoing, with regard to claims one and two, the Court **GRANTS** each motion to dismiss.

13  **II.     Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

14          Plaintiffs' claim four alleges a violation of § 10(b) of the Exchange Act and Rule 10b-5 against

15  Defendants Alphatec, Kuyper, and Wulff.  Plaintiffs assert that these Defendants omitted material

16  information from the April 16, 2010 Prospectus and in the May 10, 2010 announcement and

17  conference call, which would have made the other statements therein not misleading.  The Alphatec

18  Defendants move to dismiss, contending first that the challenged statements are protected by the

19  PSLRA's safe harbor provision, and, in the alternative, contending that Plaintiffs failed to allege

20  specific facts with the required specificity to state a valid claim for relief.

21          A.      "Safe harbor" applicability

22          Plaintiffs base their allegations in claim four on two statements from the April 16, 2010

23  Prospectus (discussed earlier) and on statements from the May 10, 2010 announcement and conference

24  call.  The statements from the May 10, 2010 announcement are: (1) Mr. Kuyper's statement that he

25

26  _____

27          [12] Plaintiffs have also failed to allege specific facts to show that Alphatec's statements that it had "already begun to realize synergies" from the acquisition and that it anticipated that its revenues throughout the balance of 2010 "will continue to grow" were actually false. (*See supra* Part I.C.2, at
28  18-19 (discussing how both of these statements were literally true).)

1   was "pleased with the progress" the company has made with the U.S. integration of Scient'x and that

2   "[a]s of April 30th, Scient'x's US operations have been consolidated into Alphatec Spine, and we

3   remain on track to realize at least $5 million of savings by eliminating redundancies in Scient'x's

4   operating expenses," and (2) Defendants' reaffirmation of their 2010 revenue guidance. (CAC ¶¶ 68-

5   70.)  The statements from the May 10, 2010 conference call are: (1) Mr. Kuyper's statement: "The

6   novel products that we have launched or plan to launch realize premium prices, offsetting broader

7   market related price declines.  We're also in a unique position to leverage our production capacity to

8   reduce costs and maintain margins over the long-term, offsetting any potential negative pricing trends,"

9   and (2) Mr. Wulff's statement that the revenue lost from dropping a Japanese distributor would be

10  offset by "the improvements both in the United States and in Europe."  (CAC ¶¶ 72, 74.)

11          Out of the above statements, Defendants' reaffirmation of the 2010 revenue guidance is

12  certainly forward-looking.  See 15 U.S.C. § 78u-5(i)(1)(A) (defining a forward-looking statement to

13  include "a statement containing a projection of revenues"); In re Cutera Sec. Litig., 610 F.3d 1103,

14  1111 (9th Cir. 2010) (earnings projection is by definition forward-looking).  Mr. Wulff's statement

15  that the revenue lost from dropping a Japanese distributor would be offset by sales improvements is

16  also forward-looking because "the truth or falsity of the statement cannot be discerned until some point

17  in time after the statement is made."  See In re Splash Tech., 160 F. Supp. 2d at 1067.

18          On the other hand, the remaining statements from the announcement and conference call either

19  concern present or historical facts, or could reasonably be viewed as "misrepresentations about current

20  business conditions," and therefore are not forward-looking.[13]  See In re Copper Mountain, 311 F.

21  Supp. 2d at 880 (characterizations of business as "solid" and "on track" were not forward-looking);

22  In re Secure Computing, 120 F. Supp. 2d at 818 (defendants' statement that the company "was on

23  track to meet analysts' earnings expectations" was not forward-looking where it could reasonably be

24  viewed as "misrepresentation[] about current business conditions"); see also Am. W. Holding Corp.,

25  320 F.3d at 937 (statements about the present effect of a past violation are not forward looking).

26

27  _____

[13] As the Court previously concluded, the two challenged statements in the April 16, 2010
28  Prospectus were not forward-looking.  See supra Part I.B, at 14-15.

10cv1673

1    To qualify for protection under the PSLRA's safe harbor provision, the forward-looking

2  statement must be accompanied by "meaningful cautionary statements identifying important factors

3  that could cause actual results to differ materially from those in the forward-looking statement." 15

4  U.S.C. § 78u-5(c)(1)(A)(I). "[B]oilerplate language warning that investments are risky or general

5  language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning."

6  *In re Cooper Mountain*, 311 F. Supp. 2d at 882. Rather, "[t]he cautionary warning ought to be precise

7  and relate directly to the forward-looking statements at issue." *Id.*

8    The two forward-looking statements in this case were identified as such and were accompanied

9  by sufficient cautionary language.  The May 10, 2010 announcement warned that it contained

10  "forward-looking statements" that were "subject to a number of risks and uncertainties that could

11  cause actual results to differ materially from those described."  (Smith Decl., Exh. 14, at 769.)

12  Specifically, it warned that the projected results may differ materially based on the following factors,

13  among others: "Alphatec's ability to meet its 2010 revenue, adjusted EBITDA, and earnings

14  projections," its "ability to successfully integrate Scient'x and Alphatec Spine," the "uncertainty of

15  success in developing new products," the "unexpected or prolonged delays in the process," and

16  "Alphatec Spine's ability to develop and expand its business in the United States [and] Asia." (*Id.*)

17  This language is sufficiently specific to qualify the statements for protection under the PSLRA's safe

18  harbor provision. *See, e.g.*, *In re Cutera*, 610 F.3d at 1112 (cautionary language was sufficient where

19  the defendant "affirmatively warned that its ability to compete and perform in the industry depended

20  on the ability of its sales force to sell products to new customers and upgraded products to current

21  customers, and that failure to attract and retain sales and marketing personnel would materially harm

22  its ability to compete effectively and grow its business"); *In re Ligand Pharms., Inc. Sec. Litig.*, No.

23  04CV1620DMS(LSP), 2005 WL 2461151, at *18 (S.D. Cal. Sept. 27, 2005) (cautionary language was

24  sufficient where the press release identified the following factors that could cause the actual results

25  to differ materially: "(1) the receipt of milestone payments, (2) the results of clinical studies, (3)

26  marketing approval for Ligand's products, and (4) the existence of a market for Ligand's new drugs").

27    Accordingly, the PSLRA's safe harbor provision protects Defendants' reaffirmation of the

28

1   2010 revenue guidance and Mr. Wulff's statement that the revenue lost from dropping a Japanese

2   distributor would be offset by sales improvements. *See In re Cutera*, 610 F.3d at 1111-12.

3       **B.**   Plaintiffs fail to state a claim under Section 10(b) and Rule 10b-5

4       To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege sufficient facts showing:

5   (1) material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of

6   security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544

7   U.S. 336, 341-42 (2005).  In the present case, the Alphatec Defendants move to dismiss Plaintiffs'

8   claim five for violations of § 10(b) and Rule 10b-5 on the ground that Plaintiffs failed to allege with

9   the required specificity: (a) a material misrepresentation or omission, and (b) scienter.

10          *1.*   *Misrepresentation or omission*

11      As opposed to the Securities Act claims, claims under the Exchange Act are subject to the

12   particularity requirements of Federal Rule of Civil Procedure 9(b).  *See Reese*, 643 F.3d at 690-91.

13   Accordingly, Plaintiffs must "state with particularity the circumstances constituting fraud or mistake,"

14   FED. R. CIV. P. 9(b), in addition to pleading plausible allegations, *see Iqbal*, 129 S. Ct. at 1949-50.

15      The Court previously determined that Plaintiffs failed to allege sufficient facts to show that the

16   two statements in the April 16, 2010 Prospectus were misleading or that Defendants omitted any

17   information from the Prospectus that they were required to disclose or that would have made the two

18   statements not misleading.  (*See supra* Part I.C, at 15-20.)  Accordingly, for the same reasons as

19   discussed above, Plaintiffs failed to allege a material misrepresentation or omission with respect to

20   these two statements for purposes of their claim under § 10(b) and Rule 10b-5.

21      The Court next addresses Plaintiffs' allegations that the following two statements were

22   misleading or that Defendants omitted information that would have made them not misleading: (1) Mr.

23   Kuyper's statement that he was *"pleased with the progress"* the company has made with the U.S.

24   integration of Scient'x, and (2) his statement: "We're also *in a unique position* to leverage our

25   production capacity to reduce costs and maintain margins over the long-term, offsetting any potential

26   negative pricing trends" (emphases added).  The Alphatec Defendants contend that these statements

27   amount to immaterial statements of corporate optimism that are not actionable.  The Court agrees.

28

1   "'[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of

2   corporate executives.'" *In re Cutera*, 610 F.3d at 1111 (citation omitted).  Similar statements have

3   been held to be non-actionable puffing. *See, e.g., id.* (defendant's assertion that "we believe our

4   employee relations are good" was a non-actionable statement of corporate optimism); *In re Syntex*

5   *Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994) (holding as non-actionable puffing the

6   phrases: "we're doing well and I think we have a great future," "business will be good this year ... we

7   expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second

8   half to be stronger than the first," "everything is clicking for the 1990s ... new products are coming in

9   a wave, not in a trickle ... old products are doing very well," and "I am optimistic about Syntex's

10  performance during this decade" (internal quotation marks omitted)).  Such "mildly optimistic,

11  subjective assessment[s] hardly amount[] to a securities violation." *In re Cutera*, 610 F.3d at 1111.

12          The Court next turns to Plaintiffs' allegation that Mr. Kuyper's statement that "[a]s of April

13  30th, Scient'x's US operations have been consolidated into Alphatec Spine, and we remain on track

14  to realize at least $5 million of savings by eliminating redundancies in Scient'x's operating expenses"

15  was misleading because Scient'x's U.S. operations had not been consolidated as of that time, the

16  Scient'x integration was in fact behind schedule due to operating system delays, and those delays

17  would cause a shortfall in the forecasted revenue.  However, once again, Plaintiffs fail to allege more

18  than conclusory facts to show that integration delays existed as of May 10, 2010, that those *integration*

19  delays were inconsistent with Mr. Kuyper's statement that Scient'x's U.S. operations had been

20  *consolidated* as of that time, and that Defendants failed to achieve the projected $5 million of savings

21  in their operating expenses. *See Ronconi*, 253 F.3d at 434 ("A company could experience 'serious

22  operational problems,' 'substantial difficulties,' and 'difficult problems' and still have increasing

23  revenues."); *see also Yourish*, 191 F.3d at 997 ("Mere 'temporal proximity between positive

24  statements stressing a firm's strengths and announcements of poor economic performance,' without

25  more, 'does not create an inference that the earlier statements were fraudulent.'" (citation omitted)).

26          Finally, Plaintiffs challenge Mr. Kuyper's statement that "[t]he novel products that we have

27  launched or plan to launch realize premium prices, offsetting broader market related price declines."

28

1    Plaintiffs allege this statement was misleading because Alphatec's profitability had already been and

2    would continue to be negatively affected by pricing pressures, and the company's "novel products"

3    were insufficient to offset those pressures in 2010. But the Court fails to see how any of this makes

4    Mr. Kuyper's statement misleading. Notably, Mr. Kuyper *did* disclose that the company was facing

5    pricing pressures, but noted that the company expected to turn those pressures into opportunities. (*See*

6    Smith Decl., Exh. 16, at 825 ("We are seeing increased pricing pressure in the US market as hospitals

7    try to decrease their costs and control the number of vendors they deal with. On some cases, this

8    presents a challenge. More often we believe this represents a significant opportunity for Alphatec.").

9        Accordingly, Plaintiffs failed to allege sufficient facts to show that any of Defendants'

10   challenged statements amounted to a material misrepresentation or omission.

11           2.      *Scienter*

12       The Alphatec Defendants next contend that Plaintiffs failed to allege with sufficient

13   particularity that Defendants acted with the requisite state of mind. Under the PSLRA, a plaintiff must

14   "state with particularity facts giving rise to a strong inference" that the defendant acted intentionally

15   or with deliberate recklessness. *See* 15 U.S.C.A. § 78u–4(b)(2)(A); *see also In re Daou*, 411 F.3d at

16   1014-15. This standard requires courts to take into account "plausible opposing inferences." *Tellabs*,

17   551 U.S. at 323. A complaint adequately pleads scienter "only if a reasonable person would deem the

18   inference of scienter cogent and at least as compelling as any opposing inference one could draw from

19   the facts alleged." *Id.* at 324. In making this determination, "the court's job is not to scrutinize each

20   allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

21       Plaintiffs assert that the following allegations, collectively, plead scienter with the sufficient

22   particularity: (1) Defendants' motive and financial gain; (2) Defendants' knowledge or reckless

23   disregard of increasing pricing pressures; (3) Defendants' awareness of lessened revenue due to

24   diminished orders from distributors and the loss of a Japanese distributor; (4) knowledge of the

25   integration delays; (5) channel stuffing; and (6) the removal of Alphatec's CFO just two months after

26   the truth was revealed on August 5, 2010. (CAC ¶¶ 83-108.) The Court does not agree.

27       With regard to the pricing pressures, as Plaintiffs acknowledge, Defendants discussed them as

28

1 │ part of the "risk factors" in other filings with the SEC. (*See, e.g.*, CAC ¶ 86 (quoting from Alphatec's

2 │ Form 10-K dated March 2, 2010); Smith Decl., Exh. 11, at 591 (Form 10-K).) These risk factors were

3 │ incorporated by reference into the Prospectus. (*See* Smith Decl., Exh. 13, at 758.) Moreover, the

4 │ pricing pressures were discussed during the May 10, 2010 conference call. (*Id.*, Exh. 16, at 825.)

5 │         Turning to Defendants' motive and financial gain, those allegations do not support a strong

6 │ inference of scienter. Plaintiffs allege that Defendants "had strong financial incentives to inflate the

7 │ price of Alphatec stock in anticipation of the Offering in April 2010. They accomplished this by

8 │ means of materially false and misleading statements provided to and omissions kept from investors."

9 │ (CAC ¶ 100.) According to Plaintiffs, Defendants "stood on both sides" of the Alphatec-Scient'x

10 │ transaction and "personally benefitted" from the Scient'x's sale to Alphatec. (CAC ¶ 101.) When

11 │ combined with "specific allegations of deliberate accounting misfeasance," corporate acquisitions may

12 │ create a strong inference of scienter. *See In re Daou*, 411 F.3d at 1023-24 (a company's eleven

13 │ stock-funded acquisitions during the class period were at least partially indicative of scienter where

14 │ the company "exchang[ed] over 6.6 million shares" of its stock and, if the stock had been properly

15 │ valued, would have been required to exchange 19,642,865 more shares to accomplish the same

16 │ purpose). To create a strong inference of scienter, however, "the corporate stock sales must be

17 │ significant enough and uncharacteristic enough to cast doubt on the defendant company's motives."

18 │ *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009). In this case, apart from

19 │ conclusory assertions, Plaintiffs failed to allege sufficient facts with the required particularity to show

20 │ that Alphatec's acquisition of Scient'x "was in any way inconsistent with the [company's] traditional

21 │ business practices." *See id.* (plaintiff's allegations that defendant "'completed a private placement

22 │ offering whereby it sold 1,785,996 units to institutional and accredited investors, raising net proceeds

23 │ of $23.5 million'" were insufficient to create a strong inference of scienter). Plaintiffs' generalized

24 │ assertions of motive based on potential profit from the Scient'x acquisition are also insufficient to meet

25 │ the heightened pleading requirements. *See id.* at 1005 ("If simple allegations of pecuniary motive were

26 │ enough to establish scienter, 'virtually every company in the United States that experiences a downturn

27 │ in stock price could be forced to defend securities fraud actions.'" (citation omitted)); *Glazer Capital*

28 │

1   *Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("[E]vidence of a personal profit motive on

2   the part of officers and directors contemplating a merger is insufficient to raise a strong inference of

3   scienter."). Finally, Plaintiffs do not allege that any of the individual Defendants sold shares in the

4   offering or during the Class Period. This lack of stock sales is inconsistent with scienter. *See Metzler*

5   *Inv. GMBH v. Corithian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).

6           Plaintiffs next allege that Defendants' knowledge of each involved company's financial

7   situation gives rise to a strong inference of scienter. For example, Plaintiffs assert that Alphatec's U.S.

8   sales volume was not increasing at anywhere near the rate required to meet the forecasted revenue.

9   (CAC ¶¶ 89-90.) However, even if that was the case, what Defendants forecasted was the increase in

10  combined revenue for both U.S. and international sales after the acquisition of Scient'x. Plaintiffs'

11  allegations with respect to the two companies' revenue growth are equally insufficient. For example,

12  Plaintiffs allege that for 2009, Alphatec incurred a net loss of over $13 million and Scient'x incurred

13  a net loss of over $17 million. (CAC ¶ 92.) They also allege that Alphatec's 2009 revenues were $132

14  million and Scient'x's revenues were $51.8 million, for a combined revenue of $183.8 million. (*Id.*)

15  Plaintiffs contend that in light of this 2009 combined revenue, Defendants should have known that the

16  2010 combined revenue guidance of $220 million to $225 million was misleading. (CAC ¶¶ 93-04.)

17  Defendants' filings with the SEC demonstrate, however, that although Alphatec operated at an annual

18  net loss, it had a steady revenue growth between 2007 and 2009. (*See* Smith Decl., Exh. 3, at 68

19  (listing revenue of $80,031,000 for 2007 and $101,313,000 for 2008, for a year-over-year revenue

20  growth of 26.6%); Exh. 10, at 547 ("Annual 2009 revenue of $132.2 million grew 30.4% over annual

21  2008 revenue.").). Accordingly, when compared to the 2009 combined revenue of $183.8 million, the

22  2010 combined revenue guidance of $220 million to $225 million amounts to a year-over-year revenue

23  growth of only 19.7% to 22.4%. In light of the substantial year-over-year revenue growth between

24  2007 and 2009, even the growth of 22.4% does not give rise to a strong inference of scienter.

25          Similarly, apart from conclusory statements, Plaintiffs fail to allege how Alphatec's prior sale

26  of Scient'x's products shows that Defendants should have known that the acquisition of Scient'x today

27  would not increase its revenue as anticipated. As previously noted, Plaintiffs fail to allege what

28

1   products were sold during the previous time, or the reason that Alphatec terminated those prior sales

2   agreements.  As for diminished orders from distributors and the loss of a Japanese distributor,

3   Defendants did disclose that information during the May 10, 2010 conference call.  (*See* Smith Decl.,

4   Exh. 16, at 827, 830.)  Apart from conclusory statements, Plaintiffs have not alleged sufficient facts

5   to show that the timing of these disclosures was misleading.  Finally, Plaintiffs have not alleged

6   sufficient facts to show that the integration delays were known or should have been known to

7   Defendants as of April 16, 2010 or May 10, 2010.  *See In re Gildan Activewear, Inc. Sec. Litig.*, 636

8   F. Supp. 2d 161, 273-74 (S.D. N.Y. 2009) (allegations that defendants "should have been aware of . . .

9   integration problems" were insufficient to show that defendants "knew or should have known at the

10  time that the costs associated with the integration were inconsistent with their ambitious earnings

11  guidance"); *In re Remec Inc. Sec. Litig.*, 415 F. Supp. 2d 1106, 1116 (S.D. Cal. 2006) (allegations that

12  defendants "knew," "recklessly disregarded," "were aware," and "had access to information they

13  needed" were too general to allege scienter with the required specificity).

14          Plaintiffs further contend that the inference of scienter is supported by one analyst's statement

15  that Scient'x engaged in channel stuffing.  As previously discussed, these allegations of "channel

16  stuffing" are wholly conclusory and, in any event, are insufficient to give rise to a strong inference of

17  scienter.  *See Wietschner*, 294 F. Supp. 2d at 1114 (channel stuffing allegations insufficient to show

18  that defendants acted with the requisite scienter); *Coble v. Broadvision Inc.*, No. C 01-01969 CRB,

19  2002 WL 31093589, at *8 (N.D. Cal. Sept. 11, 2002) (same); *In re Ramp Networks, Inc. Securities*,

20  201 F. Supp. 2d 1051, 1077 (N.D. Cal. 2002) ("A number of courts have held that 'channel stuffing'

21  gives rise to a 'very weak' inference of scienter—if any at all—in § 10(b) actions because there are

22  'a number of legitimate reasons for attempting to achieve sales earlier.'" (citation omitted)).

23          Finally, the timing of Defendant Wulff's resignation as the company's CFO, which was two

24  months after the August 5, 2010 "corrective" announcement, without any other facts about the

25  resignation, does not support a strong inference of scienter.  *See Zucco Partners*, 552 F.3d at 1002

26  ("Where a resignation occurs slightly before or after the defendant corporation issues a restatement,

27  a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result

28

1 of restatement's issuance itself in order for a resignation to be strongly indicative of scienter.").

2       For the foregoing reasons, whether taken individually or collectively, Plaintiffs' allegations are

3 insufficient to plead a strong inference of scienter with the particularity and the specificity required

4 by Federal Rule of Civil Procedure 9(b), the PSLRA, and *Iqbal*.

5       **C.**    Conclusion

6       For the foregoing reasons, Plaintiffs have failed to allege sufficient facts to show that the

7 challenged statements contained any misrepresentation or omission, or that they were made with the

8 required scienter.  Accordingly, Plaintiffs have failed to state a violation of § 10(b) of the Exchange

9 Act and Rule 10b-5 against Defendants Alphatec, Kuyper, and Wulff.  In light of the foregoing, with

10 regard to claim four, the Court **GRANTS** the Alphatec Defendants' motion to dismiss.

11 **III.**    **Violations of Section 15 of the Securities Act and Section 20(a) of the Exchange Act**

12       Plaintiffs' claims three and five allege "control person" liability under § 15 of the Securities

13 Act and § 20(a) of the Exchange Act, respectively, against Defendant Healthpoint and the individual

14 Defendants.  For "control person" liability to attach, however, there must be an underlying primary

15 violation.  *See* 15 U.S.C. §§ 77o (requiring a primary violation of § 11 or § 12(a)(2)), § 78t (requiring

16 a primary violation of any provision of the Exchange Act or of any rule or regulation thereunder); *see*

17 *also In re Bare Escentuals*, 745 F. Supp. 2d at 1082.  In this case, because the CAC fails to adequately

18 plead a primary violation under the Securities Act or the Exchange Act, the Court must also **GRANT**

19 Defendants' motions to dismiss as to Plaintiffs' claims three and five for "control person" liability.

20                               **CONCLUSION**

21       For the foregoing reasons, the Court **GRANTS** the Healthpoint Defendants', the Underwriter

22 Defendants', and the Alphatec Defendants' motions to dismiss and **DISMISSES WITH LEAVE TO**

23 **AMEND** all of Plaintiffs' claims.  Plaintiffs are granted 28 days from the filing of this Order to file

24 an amended complaint that is sufficient in itself and does not rely on any prior pleading.

25       **IT IS SO ORDERED.**

26 Date:   March   , 2012

27                               Honorable Roger T. Benitez
                              United States District Judge

28