

FILED

MAR 2 8 2013

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE MALLEN, individually and on behalf of all others similarly situated,<br><br>                                   Plaintiffs,<br><br>vs.<br><br>ALPHATEC HOLDINGS, INC.; DIRK KUYPER; PETER C. WULFF; MORTIMER BERKOWITZ, III; HEALTHPOINT CAPITAL PARTNERS, LLP; HEALTHPOINT CAPITAL PARTNERS II, LLP; JOHN H. FOSTER; JAMES R. GLYNN; STEPHEN J. HOCHSCHULER; SIRI S. MARSHALL; R. IAN MOLSON; JEFFERIES & COMPANY, INC.; CANACCORD ADAMS INC.; COWEN AND COMPANY, LLC; LAZARD CAPITAL MARKETS, LLC; and STEPHEN E. O'NEIL,<br><br>                                   Defendants. | CASE NO. 10-cv-1673 – BEN (MDD)<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>[Doc. Nos. 74, 75, 76] |

     This is a putative securities class action arising out of the acquisition by California-based Alphatec Holdings, Inc. ("Alphatec") of a French medical device company, Scient'x, S.A ("Scient'x"). Lead plaintiff is the Fresno County Employees' Retirement Association ("Plaintiff"). The defendants are split into three groups. The "Alphatec Defendants" are Alphatec, Dirk Kuyper, Peter Wulff,

1   Stephen Hochschuler, James Glynn, and Siri Marshall.  The "Healthpoint
2   Defendants" are HealthpointCapital Partners, L.P.; HealthpointCapital Partners II,
3   L.P.; Mortimer Berkowitz, III; John Foster; R. Ian. Molson; and Stephen O'Neil.
4   The "Underwriter Defendants" are Canaccord Adams, Inc.; Jefferies & Company,
5   Inc.; Cowen and Company, LLC; and Lazard Capital Markets.  Each group has
6   moved to dismiss the Second Amended Complaint ("SAC").  All three motions are
7   pending. (Doc Nos. 74, 75, 76.)

8        The Court dismissed the last iteration of the complaint in March 2012.  As
9   before, the SAC asserts claims under Sections 11, 12(a)(2), and 15 of the Securities
10  Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities
11  Exchange Act of 1934 (the "Exchange Act").  Plaintiff seeks to bring this action on
12  behalf of shareholders who acquired Alphatec common stock issued pursuant or
13  traceable to documents issued in connection with an April 2010 secondary offering,
14  and all those who acquired Alphatec common stock between April 16, 2010 and
15  August 5, 2010 (the "Class Period").

16       Plaintiff accuses the defendants—Alphatec, certain of its officers and
17  directors, major shareholders, and underwriters—of misleading investors by making
18  statements about the benefits of integrating the companies while failing to disclose
19  problems with newly acquired Scient'x inventory.  The central thrust of the SAC is
20  that defendants engaged in a scheme to: (1) inflate the price of Alphatec shares so
21  that Scient'x's principal shareholders, HealthpointCapital Partners, L.P. and
22  Healthpoint Capital Partners II, L.P. (together, "Healthpoint") could divest
23  themselves of the company; (2) enable Alphatec and Healthpoint "to sell millions of
24  Alphatec stock in the Offering at artificially inflated prices"; and (3) to enable,
25  Berkowitz, Foster, Molson, O'Neil, and Hochschuler to personally benefit.  (SAC ¶
26  2.)

27       For the reasons set forth below, the Court again **GRANTS** the Defendants'
28  motions to dismiss.  Because the previous dismissal order addressed many of the

1   same issues, significant portions are repeated below.

2   **BACKGROUND**

3   **I.    Factual background[1]**

4           Alphatec is a publicly traded, California-based company that designs,

5   manufactures, and markets products for the surgical treatment of spine disorders.

6   During the alleged class period, Kuyper was Alphatec's president and CEO.  Wulff

7   was Alphatec's vice president, CFO and treasurer.  Berkowitz was the chairman of

8   Alphatec's board.  At all relevant times, these individuals, together with Glynn,

9   O'Neil, Marshall, Hochschuler, Foster, and Molson, made up Alphatec's

10  nine-member board of directors.

11          Healthpoint is a venture capital and private equity investor tied to Alphatec

12  and, formerly, Scient'x.  It is comprised of two limited partnerships,

13  HealthpointCapital Partners L.P. and HealthpointCapital Partners II, L.P.  Prior to

14  the acquisition, Healthpoint owned approximately 38% of Alphatec and 95% of

15  Scient'x.  Alphatec directors Berkowitz, Foster, Molson, and O'Neil had various

16  ties to Healthpoint, and each serve or served on the board of managers for

17  Healthpoint LLC, Healthpoint's "ultimate parent."  Hochschuler, another Alphatec

18  director, was a medical consultant for Healthpoint during the alleged class period.

19          Plaintiff alleges that prior to the alleged class period, Scient'x was losing

20  money, and Healthpoint wanted to divest itself of the company, even at a loss.

21  Accordingly, Berkowitz and Foster used their positions at Alphatec to engineer a

22  sale.  On December 17, 2009, Alphatec announced that it had entered into a

23  definitive agreement to acquire Scient'x for 24 million shares of Alphatec common

24

25

26          [1] For purposes of resolving these motions to dismiss, the Court accepts as true all well-pleaded
    factual allegations in Plaintiff's Second Amended Complaint ("SAC").  *See Gompper v. VISX, Inc.*,
27  298 F.3d 893, 895 (9th Cir. 2002).  This factual summary is taken in the light most favorable to
    Plaintiff.  *See No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320
28  F.3d 920, 925 n.2 (9th Cir. 2003).  The Court also considers documents submitted by Defendants that
    are referenced in the SAC.  *Id.*

10cv1673

1  stock, worth approximately $118 million.[2]  (*See* Decl. of Colleen C. Smith ISO

2  Alphatec Defs.' MTD ("Smith Decl."), Exh. 7, at 182 [Doc. No. 74-3]; *see also*

3  SAC ¶¶ 54-55.)  Alphatec stated that, subject to shareholder approval, the

4  transaction was expected to close by the end of the first quarter of 2010.

5       In a press release announcing the deal, Alphatec touted various benefits, such

6  as an increased global presence; an expanded product portfolio; cross-selling

7  opportunities; and cost synergies in distribution, marketing and administrative

8  infrastructure.  It also projected 2010 *pro forma* full-year revenues for the combined

9  company in a range of $220 million to $225 million, and *pro forma* full-year 2010

10  adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA")

11  in a range of $32 million to $35 million (the "2010 revenue guidance").  (Smith

12  Decl., Exh. 7, at 182.)  Plaintiff alleges that this forecast was "particularly

13  aggressive" in light of the pricing pressures facing the U.S. and European spine

14  markets.  (SAC ¶ 61.)  Nevertheless, Alphatec reiterated this forecast, which

15  equated to 20% year-over year growth, on several occasions.

16       Plaintiff alleges that Alphatec effectively solicited investors through a

17  secondary public offering (the "Offering") to finance the acquisition.  Alphatec filed

18  a Form S-3 registration statement ("Registration Statement") with the SEC on

19  February 12, 2010, before the deal closed.  On April 16, 2010 (the first day of the

20  alleged class period), the company filed the offering's prospectus and prospectus

21  supplement (the "Prospectus").  The Prospectus included two specific statements

22  (identified with ***bold italic*** emphasis below) that Plaintiff challenges as materially

23  false or misleading:

24

25       On March 26, 2010, we completed the acquisition of Scient'x S.A., or
         Scient'x, a global medical device company based in France that designs,
26       develops and manufactures surgical implants to treat disorders of the
         spine.  Scient'x distributes products through its direct sales force in

27

28       _____
         [2] The value of Scient'x at acquisition was allegedly $53 million less than what Alphatec was
         prepared to pay for Scient'x in September 2006. (SAC ¶ 55.)

France, Italy and the U.K., and distributes products through independent distributors in more than 45 additional countries. . . .

. . . .

*We have already begun to realize synergies from the Scient'x acquisition.* Our OsseoFix Spinal Fracture Reduction System is now being sold in six countries and will be launched through Scient'x's direct sales organizations in France, Italy and the UK in the second quarter of 2010. We also expect to offer products in additional countries during 2010 as a result of our expanded international sales channel. As a result of the Scient'x acquisition we have also added 19 distribution agents in the U.S., which we believe represents an addition of approximately 40 sales representatives. In addition, we expect to achieve up to $5 million in cost savings in 2010 by reducing overlapping operations of the two companies.

The combined entity has unaudited pro forma combined 2009 revenue of $182.4 million, reflecting approximately 25% year-over-year growth. Based on preliminary financial data, we expect to report record consolidated quarterly revenues for Alphatec Holdings, Inc. of approximately $38.4 million for the first quarter of 2010, an increase of 25.6% from the $30.6 million reported for the first quarter 2009, and a sequential increase of 5.0% over fourth quarter 2009 revenues of $36.6 million. These revenue results remain subject to review by our independent registered public accounting firm in accordance with Statement on Accounting Standards No. 100. We expect that our first quarter 2010 revenues will be the eleventh consecutive quarter of record revenues. *In addition, we anticipate that our revenues throughout the balance of 2010 will continue to grow, driven by the inclusion of Scient'x revenues, cross-selling opportunities between Alphatec and Scient'x, the increased global scale of our distribution and marketing efforts, and the approval and launch of up to 15 innovative products into the U.S. and/or E.U. markets.*

(Smith Decl., Exh. 13, at 703.)[3]

The offering was completed on April 21, 2010. Alphatec and Healthpoint each sold 9.2 million shares (with over-allotments) for gross proceeds of $46 million. The following month, on May 10, 2010, Alphatec released first quarter results, which showed year-over-year revenue growth of nearly 26%. The company reaffirmed its 2010 revenue guidance (Smith Decl., Exh. 14, at 765, 767; SAC ¶ 89) and Kuyper, the CEO, told investors in a press release that he was "pleased with the progress we have made with the US integration of Scient'x into Alphatec Spine."

---

[3] The Court relies on the documents filed with the SEC for the surrounding language. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (proper to consider full text of the prospectus when ruling on a motion to dismiss, including portions not mentioned in the complaint).

1  He added: "*[a]s of April 30th, Scient'x's US operations have been consolidated*

2  *into Alphatec Spine, and we remain on track to realize at least $5 million of*

3  *savings by eliminating redundancies in Scient'x's operating expenses.*" (Smith

4  Decl., Exh. 14, at 766; SAC ¶¶ 89-90.)

5       What Alphatec never disclsosed, according to Plaintiff, is that "[a]t least as

6  early as the week of March 30-April 5, 2010, if not by the week of March 8-14,

7  2010," Defendants knew that Scient'x's products were "obsolete, defective, and/or

8  lacked sufficient documentation for their legal sale in the U.S., making their

9  integration with Alphatec's product line difficult, if not impossible." (SAC ¶¶ 9,

10  96.) The SAC contains statements from six former Alphatec and Scient'x

11  employees that Plaintiff claims support this theory. The only named witness is

12  Richard Reyes, an inventory control supervisor[4] at Alphatec from 2006 through

13  November 2010. The others are confidential witnesses ("CWs"), identified by

14  position and dates of employment.

15       According to CW2, a Scient'x logistics manager, and CW3, a Scient'x

16  information technology advisor, Alphatec had access to Scient'x's computer

17  systems and could view its inventory online by March 2010. Reyes purportedly

18  visited Scient'x's East Coast facilities twice, on March 8-14, 2010 and March

19  30-April 5, 2010 to evaluate Scient'x's product inventory. He claims that a

20  "substantial portion" of the inventory "he saw" was broken, rusted, or defective,

21  while "[o]ther inventory" was missing paperwork required for its sale in the United

22  States. (SAC ¶¶ 77-79.) Reyes states that "many" of the products had been

23  quarantined—meaning that problems needed to be fixed before they could be

24  released into regular inventory. Reyes claims that he relayed these observations to

25  Alphatec executives during two conference calls during his visits. Kuyper,

26  Alphatec's CEO, allegedly participated in the call during the week of March 30,

27

28       [4] Reyes reported to the "manager of distribution and inventory control" who in turn reported
to the "senior director of supply chain," who in turn reported to the "vice president of operations," who
was "primarily in charge of the Scient'x acquisition." (SAC ¶ 37.)

10cv1673

1   2010 in which Reyes suggested that the Scient'x inventory was not worth the cost of

2   shipping it to California.  Reyes claims that Scient'x's inventory was nevertheless

3   shipped to Alphatec "beginning on or around April 12, 2010," but that at some point

4   after he left the company, 70% was scrapped.

5        CW5, a facilities maintenance technician at Alphatec, stated that Scient'x's

6   inventory "began" arriving in California in April 2010 and "from time to time,

7   people from different departments within Alphatec would visit the warehouses to

8   search for missing documentation."  (SAC ¶ 82.)  Similarly, CW1, a senior buyer for

9   Alphatec, stated that "a huge amount" of the products that arrived from Scient'x "in

10  2010" lacked documentation, and that this issue was discussed "constantly" during

11  weekly conference calls about the progress of the Scient'x integration.  (SAC ¶ 73.)

12  CW1 purportedly received an email at some point stating that Kuyper had suggested

13  someone search for missing documentation in two palettes of paperwork.

14       Lastly, CW4, Alphatec's former regional sales manager for the Midwest

15  Region, stated that much of Scient'x's inventory was never sold and that CW4's

16  own request to sell a Scient'x product was rebuffed by a superior.

17       Plaintiff alleges that the "truth" emerged on August 5, 2010 when Alphatec

18  announced lower than expected second quarter results.  (SAC ¶ 93.)  Alphatec cut

19  its revenue guidance, projecting *pro forma* combined annual revenues of $188

20  million to $193 million, and *pro forma* combined adjusted EBITDA of $21 million

21  to $24 million.  (Smith Decl., Exh. 17, at 840.)  Alphatec's stock price plunged 46%

22  to close at $2.39 on August 6, 2010.  Two months later, on October 11, 2010,

23  Alphatec announced the removal of Wulff as Alphatec's CFO and treasurer and his

24  transition to the newly created position of senior vice president, strategic initiatives.

25       In the August announcement, Alphatec management attributed the lower-

26  than-expected growth rate to "US price pressure on our core products," "the

27  unpredictability of product approvals by the FDA," and "the complexity of

28  integrating an international organization into our operations."  (Smith Decl., Exh.

17, at 838.)  Elaborating on Scient'x, Alphatec stated:

> We have made tremendous progress in integrating Scient'x into Alphatec Spine in the second quarter.  As I previously stated, we completed the US consolidation, realizing significant cost savings, and have commenced initial integration of the international operations.  It did take longer than anticipated to get Alphatec products loaded into Scient'x's international distribution system, and for us to get Scient'x's products loaded into Alphatec's US inventory.
>
> There was a great deal of complexity involved in loading thousands of new SKU's into each respective format.  And this process took longer than we previously anticipated.  It has since been resolved and we are invoicing and shipping products across the entire organization.

(SAC ¶ 94.)  Plaintiff alleges that Alphatec began taking large inventory write-downs in 2011.  Following the announcement of its 2011 year-end results, Alphatec acknowledged "significant inventory write-offs in 2011, which amounted to $8.2 million."  The company explained: "Throughout the integration and after upgrading our senior management team, we uncovered several issues related to inventory in Europe and the U.S., which resulted in these write-offs."  (SAC ¶ 101.)

## II.      Procedural background

The initial complaint was filed on August 10, 2010.  On January 19, 2011, Fresno County Employees' Retirement Association was appointed lead plaintiff.  A Corrected Amended Class Action Complaint ("CAC") was filed on February 22, 2011.  The Court granted Defendants' motions to dismiss the CAC on March 22, 2012.  Plaintiff filed the Second Amended Class Action Complaint ("SAC") on April 19, 2012.

The SAC asserts five claims for relief.  First, it alleges that Alphatec, the individual defendants, and the Underwriter Defendants violated § 11 of the Securities Act.  Second, it alleges that Alphatec and the Underwriter Defendants violated § 12(a)(2) of the Securities Act.  Third, it alleges that Healthpoint and the individual defendants violated § 15 of the Securities Act (controlling person liability).  Fourth, it alleges that Alphatec and Kuyper violated § 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5.  Fifth, it

1   alleges that Healthpoint and the individual defendants violated § 20(a) of the

2   Exchange Act (controlling person liability).

3        The Alphatec Defendants, the Healthpoint Defendants, and the Underwriter

4   Defendants each moved to dismiss the SAC on May 3, 2012. Plaintiff filed a

5   consolidated opposition on June 4, 2012. Defendants filed three separate replies on

6   June 11, 2012. Plaintiff filed a notice of recent authority on December 27, 2012,

7   and the Alphatec Defendants filed a response, which the remaining defendants

8   joined. The Court took the matter under submission and now resolves the motions

9   pursuant to Civil Local Rule 7.1(d)(1).

10                                **LEGAL STANDARD**

11       A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of

12  the pleadings. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a

13  motion to dismiss, a complaint must contain sufficient factual matter, accepted as

14  true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

15  U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

16  (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it

17  asks for more than a sheer possibility that a defendant has acted unlawfully. Where

18  a complaint pleads facts that are 'merely consistent with' a defendant's liability, it

19  'stops short of the line between possibility and plausibility of "entitlement to

20  relief."'" *Id.* (internal citation omitted).

21       In ruling on a motion to dismiss, the Court must "accept all factual allegations

22  in the complaint as true and construe the pleadings in the light most favorable to the

23  nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). The

24  Court, however, need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678.

25  Thus, "a formulaic recitation of the elements of a cause of action will not do."

26  *Twombly*, 550 U.S. at 555. It is also improper for the Court to assume that plaintiff

27  "can prove facts that it has not alleged." *Associated Gen. Contractors of Cal., Inc.*

28  *v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). On the other hand,

1  "[w]hen there are well-pleaded factual allegations, a court should assume their

2  veracity and then determine whether they plausibly give rise to an entitlement to

3  relief." *Iqbal*, 556 U.S. at 679.

4    A securities fraud complaint under § 10(b) of the Exchange Act and SEC

5  Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil

6  Procedure 9(b) and the Private Securities Litigation Reform Act of 1995

7  ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 700-01 (9th

8  Cir. 2012). "These requirements present no small hurdle for the securities fraud

9  plaintiff." *Id.* at 701. Rule 9(b) requires that the complaint "state with particularity

10  the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The PSLRA mandates

11  that 'the complaint shall specify each statement alleged to have been misleading,

12  [and] the reason or reasons why the statement is misleading . . . .'" *In re VeriFone*

13  *Holdings*, 704 F.3d at 701 (quoting 15 U.S.C. § 78u-4(b)(1)(B)). Further, the

14  PSLRA "provides that a complaint 'state with particularity facts giving rise to a

15  strong inference that the defendant acted with the required state of mind.'" *Id.*

16  (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "Thus, the misrepresentation claims pled

17  [under the Exchange Act] must satisfy the 'particularity' requirement of Rule 9(b)

18  of the Federal Rules of Civil Procedure, the 'plausibility' requirement of *Iqbal*, and

19  the scienter requirement of the PSLRA." *Reese v. BP Exploration (Alaska) Inc.*,

20  643 F.3d 681, 690-91 (9th Cir. 2011).

21    The PSLRA does not apply to claims under the Securities Act, but a

22  complaint that "sounds in fraud" must still comply with Rule 9(b). *Rubke v. Capitol*

23  *Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). In order to comply with Rule

24  9(b), "'a plaintiff must set forth more than the neutral facts necessary to identify the

25  transaction. The plaintiff must set forth what is false or misleading about a

26  statement, and why it is false. In other words, the plaintiff must set forth an

27  explanation as to why the statement or omission complained of was false or

28  misleading.'" *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting

1  *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)). "This

2  falsity requirement can be satisfied 'by pointing to inconsistent contemporaneous

3  statements or information (such as internal reports) which were made by or

4  available to the defendants.'" *Id.* (quoting *GlenFed*, 42 F.3d at 1549).[5]

**DISCUSSION**[6]

6  **I.     Claim under section 10(b) and Rule 10(b)(5)**

7          Plaintiff claims that Alphatec and Kuyper made false and misleading

8  statements in violation § 10(b) of the Exchange Act and SEC Rule 10b-5.  Section

9  10(b) makes it unlawful for "any person . . . [t]o use or employ, in connection with

10 the purchase or sale of any security registered on a national securities exchange . . .

11 any manipulative or deceptive device or contrivance in contravention of such rules

12 and regulation as the Commission may prescribe as necessary or . . . for the

13 protection of investors."  15 U.S.C. § 78j(b).  "Commission Rule 10b-5 forbids,

14 among other things, the making of any 'untrue statement of a material fact' or the

15 omission of any material fact 'necessary in order to make the statements made ... not

16 misleading.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 17

17 C.F.R. § 240.10b-5(b)).

18         To plead a private damages action under this section, a plaintiff must allege:

19

20         [5] The Court concluded that the last version of the complaint sounded in fraud, at least with
respect to the claims against the Alphatec Defendants and the Healthpoint Defendants.  *Mallen v.*
21 *Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1123-25 (S.D. Cal. 2012).  It is unnecessary to rehash
that analysis here as the allegations in the SAC warrant the same conclusion.  *See Rubke*, 551 F.3d at
22 1161 ("Where as here, however, a complaint employs the exact same factual allegations to allege
violations of section 11 as it uses to allege fraudulent conduct under section 10(b) or the Exchange
23 Act, we can assume that it sounds in fraud.")

24         [6] The Court will take judicial notice of the SEC filings attached to the Alphatec Defendants'
motion to dismiss because those documents were either referenced in the SAC or are not subject to
25 reasonable dispute.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in
ruling on a motion to dismiss, the court "must consider the complaint in its entirety," including
26 "documents incorporated into the complaint by reference, and matters of which a court may take
judicial notice"); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (SEC filings subject
27 to judicial notice); *In re Stac*, 89 F.3d at 1405 n.4 (the court can properly consider documents "whose
contents are alleged in a complaint and whose authenticity no party questions, but which are not
28 physically attached to the pleading" (citation and internal quotation marks omitted)).

- 11 -

1   (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the

2   purchase or sale of security, (4) reliance, (5) economic loss, and (6) loss causation.

3   *Dura Pharms.*, 544 U.S. at 341-42.  Defendants contend that the SAC fails to

4   sufficiently allege a misrepresentation or omission and fails to sufficiently allege

5   scienter.  The Court agrees.

6       **A.     Misrepresentation or omission**

7       To avoid dismissal, Plaintiff must adequately allege a material

8   misrepresentation or omission.  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997,

9   1006 (9th Cir. 2002).  Plaintiff alleges three misleading statements.  Two were in

10  the April 16, 2010 prospectus: (1) "We have already begun to realize synergies from

11  the Scient'x acquisition"; and  (2) "In addition, we anticipate that our revenues

12  throughout the balance of 2010 will continue to grow, driven by the inclusion of

13  Scient'x revenues, cross-selling opportunities between Alphatec and Scient'x, the

14  increased global scale of our distribution and marketing efforts, and the approval

15  and launch of up to 15 innovative products into the U.S. and/or E.U. markets."  The

16  third statement accompanied Alphatec's May 10, 2010 announcement of  first

17  quarter results: (3) "As of April 30th, Scient'x's US operations have been

18  consolidated into Alphatec Spine, and we remain on track to realize at least $5

19  million of savings by eliminating redundancies in Scient'x's operating expenses."

20      Plaintiff does not challenge the literal truth of these statements.  Instead, it

21  asserts that Defendants' failure to disclose the inventory problems made the

22  statements misleading.  The Court is not persuaded.

23      "A statement or omission is misleading in the securities fraud context if it

24  would give a reasonable investor the impression of a state of affairs that differs in a

25  material way from the one that actually exists."  *Reese*, 643 F.3d at 691 (internal

26  citation and quotation marks omitted).  "A securities fraud complaint based on a

27  purportedly misleading omission must 'specify the reason or reasons why the

28  statements made by [the defendant] were misleading or untrue, not simply why the

1   statements were incomplete.'" *Rubke*, 551 F.3d at 1162 (quoting *Brody*, 280 F.3d at

2   1006); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103,1109 (9th Cir. 2010) ("It is

3   not enough for the investors to plead that Cutera failed to make a full disclosure

4   about its sales force. . . . 'Often, a statement will not mislead even if it is incomplete

5   or does not include all the relevant facts.'") "Allegations that are 'not necessarily

6   inconsistent' with the allegedly false statement do not establish falsity." *In re*

7   *DotHill Sys. Corp. Sec. Litig.*, No. 06-CV-228 JLS (WMc), 2009 WL 734296, at

8   *10 (S.D. Cal. Mar. 18, 2009) (citing *Ronconi v. Larkin*, 253 F.3d 423, 432-33 (9th

9   Cir. 2001)).

10          Plaintiff has not shown that the purported inventory problems caused the

11   challenged statements to be misleading.  The first statement, for example, was that

12   Alphatec had "already begun to realize synergies" from the Scient'x acquisition.

13   This statement has to be read in conjunction with the surrounding language, not in a

14   vacuum.  As the Court noted in its previous dismissal order: "[T]his statement was

15   literally true.  In the Prospectus, immediately following the statement, Alphatec

16   listed the following synergies that *have already been realized* from its acquisition of

17   Scient'x: (1) 'Our OsseoFix Spinal Fracture Reduction System is now being sold in

18   six countries,' and (2) 'As a result of the Scient'x acquisition we have also added 19

19   distribution agents in the U.S.'" *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d

20   1111, 1129 (S.D. Cal. 2012) (emphasis in original).  As before, Plaintiff does not

21   contend that either of these synergies had not been realized when this statement was

22   made or otherwise explain how the alleged inventory problems were inconsistent

23   with Alphatec realizing these synergies.  On the facts alleged, the Court is not

24   persuaded this statement was misleading.

25          The Court also is not persuaded the second statement in the Prospectus

26   painted a false portrait for investors.  Plaintiff suggests that Alphatec's awareness of

27   defective or unsalable inventory was inconsistent with Prospectus's statement about

28   continued 2010 revenue growth.  Not necessarily.  "[A] company could experience

1  'serious operational problems,' 'substantial difficulties,' and 'difficult problems'
2  and still have increasing revenues." *See Ronconi*, 253 F.3d at 434.  In *Yourish*, the
3  Ninth Circuit concluded that statements about strong international sales were not
4  rendered false by the company's knowledge that "some very heavy shipments to
5  Southeast Asia" would not repeat, because not repeating heavy shipments was not
6  plainly inconsistent with having strong international sales.  191 F.3d at 996-97.  The
7  same is true here.  Particularized facts that might establish the requisite
8  inconsistency, such as the Scient'x inventory's place in the company's 2010 revenue
9  plan, the type and value of the products affected, etc., are absent from the SAC.  Put
10  differently, Plaintiff has not made a sufficient showing that the challenged statement
11  was misleading.

12       Lastly, the Court turns to Kuyper's statement that "[a]s of April 30th,
13  Scient'x's U.S. operations have been consolidated into Alphatec Spine, and we
14  remain on track to realize at least $5 million of savings by eliminating redundancies
15  in Scient'x's operating expenses."  Plaintiff again fails to allege sufficient facts
16  demonstrating why the purported problems with Scient'x's inventory were
17  inconsistent with the actual content of Kuyper's statement, namely that Scient'x's
18  U.S. operations had been consolidated as of that time, and Alphatec was on track to
19  achieve the projected $5 million of savings in their operating expenses.

20       In light of Plaintiff's failure to allege sufficient facts to show that the
21  statements at issue were misleading, the Court need not consider whether any of the
22  alleged misrepresentations were material.  The claim is again dismissed.

23       **B.    Scienter**

24       Even assuming that Plaintiff could establish falsity, the SAC fails to
25  adequately plead that Alphatec and Kuyper possessed the requisite scienter when
26  they made the challenged statements.  Scienter is "a mental state embracing intent to
27  deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551
28  U.S. 308, 319 (2007) (internal quotation marks omitted).  The PSLRA sets the

1   pleading bar high for this element.  A plaintiff must state with particularity facts

2   giving rise to a "strong inference" that the defendant acted intentionally or with

3   deliberate recklessness.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir.

4   2005).  "The factual allegations must not only be particular, but also must strongly

5   imply contemporaneous knowledge that the statement was false when made." *In re*

6   *Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1102 (C.D. Cal. 2003)

7   (quoting *Read-Rite*, 335 F.3d at 847).  A strong inference exists "only if a

8   reasonable person would deem the inference of scienter cogent and at least as

9   compelling as any opposing inference one could draw from the facts alleged."

10  *Tellabs*, 551 U.S. at 324.  Although a plaintiff's allegations of scienter should be

11  examined holistically, *id.* at 325,  a "dual analysis," which looks at the allegations

12  individually and then in combination, is permissible, "so long as it does not unduly

13  focus on the weakness of the individual allegations to the exclusion of the whole

14  picture," *In re VeriFone Holdings*, 704 F.3d at 703.  "Where pleadings are not

15  sufficiently particularized or where, taken as a whole, they do not raise a 'strong

16  inference' that misleading statements were knowingly or [with] deliberate

17  recklessness made to investors, a private securites complaint is properly dismissed

18  under Rule 12(b)(6)."  *Ronconi*, 253 F.3d at 429.

19      Plaintiff contends that the following give rise to a strong inference of

20  scienter: (1) witness accounts; (2) the defendants' "admissions" concerning

21  inventory write downs; (3) the short time period between the challenged statements

22  and the "revelation of the truth"; (4) the removal of Wulff as CFO and treasurer; (5)

23  the company's small size; and (6) defendants' motive.

24      The Court is not convinced.  Read carefully, the witness statements provide

25  little evidence of fraudulent intent.  The most that can be made of Reyes's statement

26  is that he gave a negative assessment of Scient'x's inventory to some Alphatec

27  executives during the week of March 8 and to Kuyper during the week of March 30.

28  But Plaintiff must do more than allege defendants' general knowledge of

- 15 -

1   problems—"[p]roblems and difficulties are the daily work of business people,"

2   *Ronconi*, 253 F.3d at 435.  Reyes' imprecise comments provide no hint of whether

3   anyone shared his assessment of inventory as "useless" or whether the problems he

4   described were inconsistent with defendants' later statements about continued

5   revenue growth, the realization of synergies, and the realization of cost savings from

6   the elimination of redundancies.  Given that Alphatec shipped the inventory to

7   California and that employees continued to look for missing paperwork once it

8   arrived (SAC ¶¶ 81-82), a more reasonable inference is that company officials

9   thought some problems could be rectified.

10       The confidential witness statements do not add much to Plaintiff's scienter

11   allegation.  In the Ninth Circuit, "confidential witnesses whose statements are

12   introduced to establish scienter must be described with sufficient particularity to

13   establish their reliability and personal knowledge." *Zucco Partners, LLC v.

14   Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  In addition, "those statements

15   which are reported by confidential witnesses with sufficient reliability and personal

16   knowledge must themselves be indicative of scienter." *Id.*

17       The gist of CW1's statement is that "a huge amount" of the Scient'x products

18   that arrived at Alphatec "in 2010" lacked documentation and that it was an issue

19   discussed during weekly conference calls.  CW1 was a senior buyer for Alphatec

20   from 2007 until August 2011 who "was involved" in the transfer of Scient'x

21   inventory from Scient'x's East Coast facilities to Alphatec's headquarters.  CW1

22   also apparently received an email (at some unspecified time) relaying Kuyper's

23   suggestion that someone look for the missing documentation in two palettes of

24   paperwork.  Such allegations are far too vague to support a strong inference of

25   scienter.  CW1 does not indicate, for example, who else participated in these

26   conference calls, when they occurred relative to the challenged statements, and what

27   options were discussed.  In the Court's view, the e-mail suggests that Kuyper

28   viewed the documentation issues as a problem that could be solved.

1    The statements of CW2 and CW3 are not much help to Plaintiff either.  Both

2  former Scient'x employees, CW2 and CW3 claim that by March 2010, Alphatec had

3  the ability to view Scient'x's inventory online.  What is missing from these

4  statements is the type of information that was available online and who at Alphatec

5  was exposed to it.  Without that type of particularized detail, the Court fails to see

6  how either statement is suggestive of scienter.  Along similar lines, CW5's[7]

7  assertion that "people" from different departments would visit the Alphatec

8  warehouses "from time to time" to search for missing documentation is far too

9  vague.

10    The only other statement is from CW4, a regional sales manager at Alphatec

11  from April 2010 to November 2010.  CW4 reportedly attended annual quarterly

12  sales meetings run by Kuyper and the vice president of sales.  CW4 claims that

13  "Alphatec's sales force was never allowed to sell Scient'x products."  This might

14  assist an inference of scienter under certain circumstances.  Here, though, there is no

15  indication when there meetings occurred relative to the challenged statements.

16  CW4' s first month on the job appears to have been the same month that two of the

17  three challenged statements were made.  At this level of detail, CW4's statement

18  does not support a strong inference that Kuyer and the others at the top of

19  Alphatec's hierarchy had contemporaneous knowledge of issues inconsistent with

20  their statements.

21    Plaintiff again alleges that defendants' personal profit motives support a

22  strong inference of scienter.  It explains: "Defendants each had strong financial

23  incentives to inflate the price of Alphatec stock in anticipation of the Offering in

24  April 2010" and "[t]hey accomplished this by means of materially false and

25  misleading statements provided to and omissions kept from investors."  (SAC ¶

26  103.)  The Court rejected this argument in its last order and sees no reasons to

27

28    _____

[7] CW5 was a "Facilities Maintenance Technician" at Alphatec who helped unload the "truckloads" of Scient'x's product inventory that arrived at Alphatec.  (SAC ¶ 42.)

1  revisit that conclusion. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736,

2  748 (9th Cir. 2008) ("[E]vidence of a personal profit motive on the part of officers

3  and directors contemplating a merger is insufficient to raise a strong inference of

4  scienter."). Plaintiff suggests that stock sales by an Alphatec executive, Stephen

5  Lubischer, who is not named in this action support its theory, but the sales activity

6  of a non-party "is not relevant to the Court's determination of scienter." *Callan v.*

7  *Motricity Inc.*, No. C11-1340 TSZ, 2013 WL 195194, at *24 n.13 (W.D. Wash. Jan.

8  17, 2013).

9       Plaintiff next asserts that inventory write-offs in 2011, which Alphatec

10  attributed to "issues related to inventory in Europe and the U.S." uncovered

11  "throughout the integration" demonstrate Defendants' contemporaneous knowledge

12  that the challenged statements were misleading. In the Court's view, this statement

13  is far too general about what those "issues" were and when they were uncovered to

14  strongly suggest that Defendants knowingly, or with deliberate recklessness, made

15  misleading statements in April and May 2010 about synergies, cost savings, or

16  revenue growth.

17       Plaintiff next asserts that Alphatec's small size—460 employees—supports a

18  strong inference of scienter. Beyond a headcount, however, Plaintiff fails to allege

19  specific facts about the company's operations that would suggest more than a

20  minimal inference of scienter.

21       Plaintiff next asserts that the short time period between the challenged

22  statements and the announcement of lowered earnings guidance in August 2010 and

23  Wulff's subsequent resignation is suggestive of scienter. The Court disagrees. On

24  the facts alleged, the most reasonable inference to draw from Wulff's transition to a

25  senior vice president role is that he was removed in response to the negative

26  earning, not because he had committed fraud. Further, the revised guidance,

27  including Alphatec's explanation was not plainly inconsistent with the prior

28  statements regarding synergies realized, cost savings projected, and a continued

1 │ expectation of revenue growth, despite Plaintiff's characterization of the August

2 │ announcement as "the disclosure of the truth."  The timing is not strongly

3 │ suggestive of fraud

4 │   Finally, the Court must consider all of these allegations holistically. *See*

5 │ *South Ferry LP, No. 2 v. Killinger*, 542 F. 3d 776, 784 (9th Cir. 2008) ("The

6 │ Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to

7 │ be read together to meet the PSLRA requirement[.]")  Even reading the

8 │ aforementioned allegations as a whole, however, the Court concludes that the SAC

9 │ fails to raise an inference of scienter that is cogent and compelling.  Plaintiff's

10 │ allegations lack the detail and specificity to clear the hurdles imposed by Federal

11 │ Rule of Civil Procedure 9(b), the PSLRA, and *Iqbal*.

12 │  **C.** **Conclusion**

13 │   Because Plaintiff has failed to allege sufficient facts to show a

14 │ misrepresentation or scienter, the claims brought under § 10(b) and Rule 10b-5

15 │ against Alphatec and Kuyper are dismissed.

16 │ **II.** **Claims under sections 11 and 12(a)(2)**

17 │   Plaintiff also asserts claims under § 11 and § 12(a)(2) of the Securities Act.

18 │ Specifically, Plaintiff contends that the issues with Scient'x's inventory should have

19 │ been disclosed in Alphatec's registration statement and prospectus.  The § 11 claim

20 │ is alleged against Alphatec, the individual defendants, and the Underwriter

21 │ Defendants.  The § 12(a)(2) claim is alleged against Alphatec and the Underwriter

22 │ Defendants.

23 │   The Securities Act "was designed to provide investors with full disclosure of

24 │ material information concerning public offerings of securities in commerce, to

25 │ protect investors against fraud and, through the imposition of specified civil

26 │ liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst*

27 │ *v. Hochfelder*, 425 U.S. 185, 195 (1976).  Section 11 "provides a cause of action to

28 │ any person who buys a security issued under a materially false or misleading

1    registration statement." *In re Century Aluminum Co. Sec. Litig.*, 704 F.3d 1119,

2    1120 (9th Cir. 2013).  A plaintiff must allege: "(1) that the registration statement

3    contained an omission or misrepresentation, and (2) that the omission or

4    misrepresentation was material, that is, it would have misled a reasonable investor

5    about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th

6    Cir. 1994).  Along the same lines, § 12(a)(2) provides for civil liability of securities

7    sellers who use a prospectus containing untrue statements or material omissions. *In*

8    *re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 980 (N.D. Cal. 2007).

9        Plaintiff asserts two bases for liability under the Exchange Act: (1) the facts

10    related to Scient'x's inventory constituted "known trends or uncertainties" that

11    Defendants had a duty to disclose under an SEC regulation; and (2) the same facts

12    should have been disclosed to make other statements in the offering documents not

13    misleading.

14        Defendants contend that the Exchange Act claims should be dismissed

15    because Plaintiff fails to adequately plead a misrepresentation or omission.  The

16    Court agrees.

17        **A.**      **Omission of facts required to be disclosed**

18        One potential basis for liability under §§ 11 and 12(a)(2) is "an omission in

19    contravention of an affirmative legal disclosure obligation." *Panther Partners, Inc.*

20    *v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).  Such an obligation can

21    arise under Item 303(a) of SEC Regulation S-K.  *See Steckman v. Hart Brewing,*

22    *Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).  Item 303 requires that a registrant

23    describe any "known trends or uncertainties" that the registrant "reasonably expects

24    will have a material . . . unfavorable impact on net sales or revenues or income from

25    continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  To state a claim based on

26    failure to comply with Item 303, a plaintiff "must allege facts showing defendants

27    knew of an adverse trend, the material impact of that trend, and 'that the future

28

1   material impacts are reasonably likely to occur from the present-day perspective.'"

2   *Belodoff v. Netlist, Inc.*, No. SACV 09-00677 DOC (MLGx), 2009 WL 2777320, at

3   *9 (C.D. Cal. Sept. 1, 2009) (quoting *Steckman*, 143 F.3d at 1297).

4        Plaintiff contends that "Scient'x's poor product quality, its lack of proper

5   documentation, and its ultimate unsalability" constituted a trend or uncertainty that

6   Defendants were obligated to disclose in the Prospectus pursuant to Item 303.

7   Defendants argue that Plaintiff fails to allege a "known trend," much less a

8   "material" trend.  More fundamentally, they argue, Item 303 only applies to "reports

9   for full fiscal years," not prospectuses. *See In re Metricom Secs. Litig.*, No. C 01-

10  4085 PJH, 2004 WL 966291, at *19 (N.D. Cal. Apr. 29, 2004) ("It is not applicable

11  to interim reports, to press releases, or to other communications with shareholders.")

12       Assuming, *arguendo*, that Item 303(a) applies to Alphatec's offering

13  documents, Plaintiff fails to plausibly allege that the inventory issues known *by*

14  *April 16, 2010* constituted a known trend reasonably likely to have a material

15  unfavorable impact on Alphatec's revenues.  The most that can be made of the

16  allegations in the SAC is that, the month prior to April 16, 2010, one Alphatec

17  employee, Reyes, had conveyed to senior management a "substantial portion" of the

18  inventory "he saw" at Scient'x was broken, rusted, or defective, "[o]ther inventory"

19  was missing paperwork required for its sale in the United States, and that in his

20  opinion, it was not worth the money to ship it to Alphatec.  According to Reyes, the

21  inventory arrived at Alphatec "beginning on or around April 12, 2010," only a few

22  days before the Prospectus was issued.  The Court is hard pressed to see how

23  Alphatec's decision makers fully appreciated a "known trend" on April 16, 2010.

24  Further, Plaintiff fails to allege sufficient facts to show that Defendants knew *at that*

25  *time* the material impact of any inventory problems or that any future material

26  impacts were reasonably likely to occur.  Although CW1 indicates that he traveled

27  to Scient'x "as early as 2008 or 2009" to evaluate the inventory, there is no

28

1  indication of what he saw, or even whether the inventory was the same.

2       A close look at *Panther Partners*, the case relied on by Plaintiff, is telling.  In

3  *Panther Partners*, the Second Circuit held that a complaint plausibly alleged that

4  customer reports of product defects and their potential impact on the seller

5  constituted a known uncertainty that should have been disclosed in connection with

6  a secondary offering of securities.  681 F.3d at 122.  But much more was alleged in

7  that case.  In the weeks leading up to a secondary offering, the seller had received

8  an increasing number of complaints about the defective products (semiconductor

9  chips) from *two of its largest customers*.  The Second Circuit designated as

10  "critical" the allegations that: (1) those two customers accounted for 72% of the

11  company's revenues; and (2) the company knew at the time that as a result of the

12  defects, it might have to accept returns on *all* the chips that it had sold to those two

13  customers.  *Id.* at 121.  Further, company officers regularly traveled to Japan to meet

14  with those customers to discuss possible solutions.  *Id.*  The SAC in this case lacks

15  equivalent "critical allegations."  It describes a variety of inventory problems in

16  broad terms.  Without knowing more about Alphatec's specific expectations for

17  Scient'x then-existing inventory, it is hard to infer anything about the potential

18  impact of these issues on Alphatec's revenues, much less defendants' awareness of

19  that potential impact.  Accordingly, Plaintiff fails to plausibly allege that defendants

20  violated a disclosure duty under Regulation S-K.

21       **B.      Omission of information necessary to make other statements not**

22  **misleading.**

23       In the alternative, Plaintiff argues that Defendants were obligated to disclose

24  the inventory issues to make other statements in the offering documents not

25  misleading.  (SAC ¶¶ 125-27.)  The "statements" at issue are two of the same three

26  analyzed above, namely: "We have already begun to realize synergies from the

27  Scient'x acquisition" and "[W]e anticipate that our revenues throughout the balance

28

1   of 2010 will continue to grow. . . ." For similar reasons, the Court concludes that
2   Plaintiff fails to plausibly allege that these statements were misleading in the
3   context of the Exchange Act claims.

4       **C.**    **Conclusion**

5       The SAC does not adequately allege a material misrepresentation or
6   omission.  Accordingly, Plaintiffs have failed to state a claim §§ 11 or 12(a)(2) of
7   the Securities Act upon which relief can be granted.  In light of the foregoing,
8   claims one and two are dismissed.

9   **III.**    **Control Person Liability**

10      Finally, Plaintiff asserts that Healthpoint and the individual defendants are
11  liable as "control persons" under § 15 of the Securities Act and § 20(a) of the
12  Exchange Act.  There must be an underlying primary violation before "control
13  person" liability can attach. *See* 15 U.S.C. § 77o (requiring a primary violation of
14  § 11 or § 12(a)(2)), § 78t (requiring a primary violation of any provision of the
15  Exchange Act or of any rule or regulation thereunder).  Because the SAC fails to
16  adequately plead a primary violation under the Securities Act or the Exchange Act,
17  the claims brought under § 15 of the Securities Act and § 20(a) of the Exchange Act
18  are dismissed.

19  *//*

20  *//*

21  *//*

22

23

24

25

26

27

28

10cv1673

1

## CONCLUSION

2     For the foregoing reasons, the Court **GRANTS** the Healthpoint Defendants',

3 the Underwriter Defendants', and the Alphatec Defendants' motions to dismiss.

4 Because of Plaintiff's inability to cure the deficiencies in its pleading, the Court's

5 dismissal is **with prejudice**.  *See Zucco*, 552 F.3d at 1007 ("[W]here the [party] has

6 previously been granted leave to amend and has subsequently failed to add the

7 requisite particularity to its claims, '[t]he district court's discretion to deny leave to

8 amend is particularly broad.'" (quoting *In re Read-Rite Corp.*, 335 F.3d 843, 845

9 (9th Cir. 2003)).

10    **IT IS SO ORDERED.**

11

Date: March _28_, 2013

12                                    _____
                                     Honorable Roger T. Benitez
                                     United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10cv1673